## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**CONNECTICUT GENERAL LIFE INSURANCE COMPANY**
900 COTTAGE GROVE ROAD
BLOOMFIELD, CT 06002

**CIGNA HEALTH AND LIFE INSURANCE COMPANY**
900 COTTAGE GROVE ROAD
BLOOMFIELD, CT 06002

**PLAINTIFFS,**

**V.**

**ADVANCED SURGERY CENTER OF BETHESDA LLC**
6430 ROCKLEDGE DRIVE, SUITE 160
BETHESDA, MD 20817

**BETHESDA CHEVY CHASE SURGERY CENTER LLC**
6931 ARLINGTON ROAD, SUITE E
BETHESDA, MD 20814

**DEER POINTE SURGICAL CENTER LLC**
6503 DEER POINTE DRIVE, SUITE A
SALISBURY, MD 21804

**HAGERSTOWN SURGERY CENTER LLC**
11236 ROBINWOOD DRIVE, SUITE 201
HAGERSTOWN, MD 21742

**LEONARDTOWN SURGERY CENTER LLC**
40900 MERCHANTS LANE, SUITE 200
LEONARDTOWN, MD 20650

**MAPLE LAWN SURGERY CENTER LLC**
7625 MAPLE LAWN BLVD, SUITE 110
FULTON, MD 20759

Civil Action No.: _____

**MARYLAND SPECIALTY SURGERY CENTER**
509 PROGRESS DRIVE, SUITE 100
LINTHICUM, MD 21090

**MONOCACY SURGERY CENTER LLC**
4991 NEW DESIGN ROAD, SUITE 103
FREDERICK, MD 21703

**PICCARD SURGERY CENTER LLC**
1330 PICCARD DRIVE, SUITE 102
ROCKVILLE, MD 20850

**RIVA ROAD SURGICAL CENTER LLC**
2635 RIVA ROAD, SUITE 118
ANNAPOLIS, MD 21401

**SURGCENTER AT NATIONAL HARBOR LLC DBA
HARBORSIDE SURGERY CENTER**
125 POTOMAC PASSAGE, SUITE 200
NATIONAL HARBOR, MD 20745

**SURGCENTER OF GLEN BURNIE LLC**
308 HOSPITAL DR., SUITE 102
GLEN BURNIE, MD 21061

**SURGCENTER OF GREENBELT LLC**
7300 HANOVER DRIVE, SUITE 102
GREENBELT, MD 20770

**SURGCENTER OF SILVER SPRING LLC**
8710 CAMERON STREET, SUITE 100
SILVER SPRING, MD 20910

**SURGCENTER OF SOUTHERN MARYLAND LLC**
9001 WOODYARD ROAD, SUITE B
CLINTON, MD 20735

**SURGCENTER OF WESTERN MARYLAND LLC**
12252 WILLIAMS ROAD SE, SUITE 103
CUMBERLAND MARYLAND 21502

**SURGCENTER OF WHITE MARSH LLC**
11605 CROSSROADS CIRCLE, SUITE A
BALTIMORE, MD 21220

**SURGICAL CENTER DEVELOPMENT, INC. D/B/A
SURGCENTER DEVELOPMENT**
PO BOX 1708
PISMO BEACH, CA 93448

**TIMONIUM SURGERY CENTER LLC**
1954 GREENSPRING DRIVE, SUITE LL18
LUTHERVILLE, MD 21093

**UPPER BAY SURGERY CENTER LLC**
360 E PULASKI HIGHWAY # 2A
ELKTON, MD 21921

**WINDSOR MILL SURGERY CENTER LLC**
2373 NORTH ROLLING ROAD
WINDSOR MILL, MD 21244

**DEFENDANTS.**

**PLAINTIFFS' ORIGINAL COMPLAINT**

Plaintiffs Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company (collectively "Cigna") file this Original Complaint against Defendants Advanced Surgery Center of Bethesda LLC, Bethesda Chevy Chase Surgery Center LLC, Deer Pointe Surgical Center LLC, Hagerstown Surgery Center LLC, Leonardtown Surgery Center LLC, Maple Lawn Surgery Center LLC, Maryland Specialty Surgery Center LLC, Monocacy Surgery Center LLC, SurgCenter at National Harbor LLC d/b/a Harborside Surgery Center, Piccard Surgery Center LLC, Riva Road Surgical Center LLC, SurgCenter of Glen Burnie LLC, SurgCenter of Greenbelt LLC, SurgCenter of Silver Spring LLC, SurgCenter of Southern Maryland LLC, Timonium Surgery Center LLC, SurgCenter of Western Maryland LLC, SurgCenter of White Marsh LLC, Windsor Mill Surgery Center LLC, Upper Bay Surgery Center LLC (collectively, the "ambulatory surgery centers" or "ASCs"), and Surgical Center Development, Inc. d/b/a SurgCenter Development ("SurgCenter" and together, with the ASCs, "Defendants") and allege as follows:

**INTRODUCTION**

1.      SurgCenter has entered into 20 separate conspiracies with each of the Defendant ASCs. SurgCenter conspired with each of the ASCs to engage in fraudulent "dual pricing" and "fee forgiving" schemes, whereby the ASCs charge their patients little or nothing for out-of-network medical services while charging exorbitant rates to the patient's health insurance plans administered through Cigna.

2.      The ASCs are "out-of-network" or "non-participating" providers, meaning they do not have contracts with Cigna.

3.      Each ASC—with significant support and assistance from SurgCenter—lured Cigna's plan members in as patients by offering to bill and collect for surgical procedures at the plan members' "in-network" or lower benefits levels, even though the ASCs knew that, because they are out-of-network facilities, the plan members' out-of-network benefits levels should apply.

4.      The ASCs then each followed an undisclosed dual pricing scheme developed in coordination with SurgCenter, in which each ASC billed Cigna's plan members rates based on Medicare schedules to approximate in-network contract rates, while submitting charges as much as tens of thousands of dollars higher to Cigna. The ASCs do not disclose to Cigna the lower Medicare-based rates charged to patients, and do not disclose to their patients the much higher rates that the ASCs charge to Cigna.

5.      As an example, for one of the patients described below, the ASC submitted "charges" of $28,606.88 to Cigna. The member had an out-of-network co-insurance requirement of 20 percent. But through an internal investigation, Cigna found out that the ASC quoted to the patient a charge of only $5,787.50, or approximately five times lower than the charge submitted to Cigna. After already starting at the much lower baseline charge based on Medicare rates, the ASC then charged the patient his or her *in-network* cost-sharing levels (co-insurance, co-payments, and deductibles), rather than the applicable out-of-network cost-sharing levels that the plan member was responsible for under the member's plan. As a result, the ASC charged the patient only $431.88, which was a small fraction of the patient's cost-sharing responsibility under his or her plan. As another example, one of the Defendant ASCs sent a claim form to Cigna listing $9,907.00 as its charges. Based on this claim form, Cigna paid the ASC $3,369.82 and the patient was responsible to pay $4,555.78, but Cigna later discovered the ASC billed the patient only $90.77.

6.      As is the case with all of their patients covered by Cigna plans, the ASCs excuse the patients from paying anything more than the small amounts that the patients paid to the ASCs pursuant to this dual pricing scheme. Indeed, after billing disputes arose between Cigna and the ASCs regarding the ASCs' fee-forgiving practices, several of the ASCs have reassured patients that the ASCs will not charge them any additional amounts.

7.      Put simply, the inflated "charges" that the ASCs submitted to Cigna are fraudulent, as these "charges" bear no relation to the amounts the ASCs actually charged their patients.

8.      Courts have consistently found that these types of billing practices are improper and have affirmed healthcare plans' right not to cover the artificial inflated "charges" that providers like the ASCs submit. Indeed, courts, state legislatures, and other governmental bodies have recognized that these schemes victimize health care benefits plans and the clients who sponsor them, members of these plans, and managed care companies like Cigna, by exponentially increasing healthcare costs for employers and employees.

9.      Two states, Colorado and Florida, have already declared these types of schemes illegal and have enacted statues to stop them. *See* Colo. Rev. Stat. Ann. §18-13-119 (West 2011); Florida Statutes § 817.234(7).

10.      The net effect of the Defendants' schemes was, among other things, to mislead Cigna plan members into believing that the ASCs could offer services at Cigna's in-network benefits levels when, in fact, the ASCs could not in order to artificially increase the cost of healthcare to Cigna and its clients.

11.      In addition, after Cigna discovered the fraudulent scheme and began disputing the ASCs' bills, several of the ASCs have made false and malicious statements to Cigna members in

an effort to harm Cigna's relationship with its members, mislead Cigna members about the terms of their healthcare plans, and further conceal the nature of the ASCs' fraudulent billing schemes.

12.     SurgCenter-affiliated ASCs in Maryland alone have fraudulently induced Cigna into paying more than $20 million as a result of their fee-forgiving schemes.

13.     In this action, Cigna seeks to recover the payments made to the ASCs and to prevent SurgCenter and the ASCs from continuing their fraudulent billing schemes against Cigna.  By bringing this action, Cigna is ensuring that its clients and plan members are charged only appropriate amounts for services rendered and thereby helping to maintain the affordability of healthcare coverage for individuals and employers.

## PARTIES

14.     Plaintiff Connecticut General Life Insurance Company is a company organized under the laws of the State of Connecticut, with its principal place of business in Bloomfield, Connecticut.

15.     Plaintiff Cigna Health and Life Insurance Company is a company organized under the laws of the State of Connecticut, with its principal place of business in Bloomfield, Connecticut.

16.     Defendant Advanced Surgery Center of Bethesda LLC is a Maryland limited liability company with its principal place of business in Bethesda, Maryland.

17.     Defendant Bethesda Chevy Chase Surgery Center LLC is a Maryland limited liability company with its principal place of business in Bethesda, Maryland.

18.     Defendant Deer Pointe Surgical Center LLC is a Maryland limited liability company with its principal place of business in Salisbury, Maryland.

19.     Defendant Hagerstown Surgery Center LLC is a Maryland limited liability company with its principal place of business in Hagerstown, Maryland.

20.     Defendant Leonardtown Surgery Center LLC is a Maryland limited liability company with its principal place of business in Leonardtown, Maryland.

21.     Defendant Maple Lawn Surgery Center LLC is a Maryland limited liability company with its principal place of business in Fulton, Maryland.

22.     Defendant Maryland Specialty Surgery Center LLC is a Maryland limited liability company with its principal place of business in Linthicum, Maryland.

23.     Defendant Monocacy Surgery Center LLC is a Maryland limited liability company with its principal place of business in Frederick, Maryland.

24.     Defendant Piccard Surgery Center LLC is a Maryland limited liability company with its principal place of business in Rockville, Maryland.

25.     Defendant Riva Road Surgical Center LLC is a Maryland limited liability company with its principal place of business in Annapolis, Maryland.

26.     Defendant SurgCenter at National Harbor LLC d/b/a Harborside Surgery Center is a Maryland limited liability company with its principal place of business in National Harbor, Maryland.

27.     Defendant SurgCenter of Glen Burnie LLC is a Maryland limited liability company with its principal place of business in Glen Burnie, Maryland.

28.     Defendant SurgCenter of Greenbelt LLC is a Maryland limited liability company with its principal place of business in Greenbelt, Maryland.

29.     Defendant SurgCenter of Silver Spring LLC is a Maryland limited liability company with its principal place of business in Silver Spring, Maryland.

30.     Defendant SurgCenter of Southern Maryland LLC is a Maryland limited liability company with its principal place of business in Clinton, Maryland.

31.     Defendant SurgCenter of Western Maryland LLC is a Maryland limited liability company with its principal place of business in Cumberland, Maryland.

32.     Defendant SurgCenter of White Marsh LLC is a Maryland limited liability company with its principal place of business in Middle River, Maryland.

33.     Defendant Surgical Center Development, Inc. is a Nevada corporation with its principal place of business in Pismo Beach, California.

34.     Defendant Timonium Surgery Center LLC is a Maryland limited liability company with its principal place of business in Timonium, Maryland.

35.     Defendant Upper Bay Surgery Center LLC is a Maryland limited liability company with its principal place of business in Elkton, Maryland.

36.     Defendant Windsor Mill Surgery Center LLC is a Maryland limited liability company with its principal place of business in Windsor Mill, Maryland.

## JURISDICTION AND VENUE

37.     This Court has personal jurisdiction over the parties because the ASC Defendants are located in this State and because all Defendants systematically and continuously conduct business in this State and otherwise have minimum contacts with this State sufficient to establish personal jurisdiction.  Further, this Court has personal jurisdiction over Defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") § 18 U.S.C. § 1965(a)-(b).

38.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution, laws, or treaties of the United States.  Specifically, Plaintiffs assert claims in this case that arise under the Employee Retirement Income Security Act

of 1974 ("ERISA"), 29 U.S.C. § 1001 et. seq. and RICO 18 U.S.C. § 1962(c).  The Court has

jurisdiction over Cigna's remaining claims pursuant to 28 U.S.C. § 1367 because the state and

common law claims alleged herein are so related to the federal claims that they form part of the

same case or controversy.

39.    In addition, the Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1332, as there is complete diversity between Plaintiffs and Defendants, and the amount

in controversy substantially exceeds $75,000. Plaintiffs are both citizens of Connecticut. The

Defendant ASCs are citizens of Maryland and Defendant SurgCenter is a citizen of California and

Nevada. With respect to all Defendants, absent injunctive relief, Cigna has suffered or will suffer

substantially in excess of $75,000 in damages as a result of Defendants' actions described herein.

40.    Venue is proper in the District of Maryland because the ASCs may be found in this

judicial district, and a substantial part of the events giving rise to the claims in this action occurred

in the District of Maryland.  29 U.S.C. §§ 1132(e)(2), 1391(b)(1), and 1391(b)(2).  Specifically,

many of the patients identified in the claims for reimbursement submitted by the ASCs reside in

this District, the services provided to Cigna's customers for which certain ASCs obtained

payments from Cigna were performed in this District, and the ASCs and SurgCenter conduct

business within this District.

## FACTUAL BACKGROUND

### *Relevant Facts Regarding Managed Care and Cigna-Administered Plans.*

41.    Cigna, among other things, insures and administers employee health and welfare

benefit plans.

42.     The vast majority of Cigna-administered plans are Administrative Services Only ("ASO") plans funded by the employers who sponsor them, with Cigna serving as the plans' claims administrator.

43.     Some of the employers who have been victimized by paying the ASCs' exorbitant, fraudulent "charges" are government entities. For example, Cigna administers ASO plans for the following public entities in Maryland:  Anne Arundel County Government, Baltimore County, Baltimore County Community College, Baltimore County Public Schools, Board of Education of Allegany County, Local Government Insurance Trust (which covers several public entities in Maryland), Maryland-National Capital Park and Planning Commission, Montgomery College, Montgomery County Public Schools, Prince George's County Government. Thus, some of the funds paid to fraudulent providers like the ASCs are ultimately paid with taxpayer dollars.

44.     Certain Cigna entities also offer fully-insured plans, which are funded by the Cigna entity. Pursuant to these fully-insured plans, Cigna has paid substantially more than $75,000 out of its own funds to the Defendant ASCs.

45.     Regardless of the type of plan funding, the plan documents authorize Cigna to recover any overpayments made by the plans on the plans' behalf.

46.     Regardless of the type of plan funding, Cigna serves as a claims administrator for each plan and exercises discretionary authority over the administration of the plan.

47.     The vast majority of the plans under which the ASCs have sought benefits are governed by ERISA.

48.     Most of the plans at issue here offer members the choice of receiving services either from health care providers that contract with Cigna to participate in Cigna's provider network or from providers outside of that network.

49.     Cigna-administered health plans reimburse their members for certain healthcare costs, defined in the plans as "covered expenses." When a Cigna plan member receives medical services, Cigna determines what part of the member's cost is considered for coverage by the plan, known as the "allowed amount."

50.     There are different types of member responsibility, including deductibles, benefit limits, co-payments, and co-insurance.

51.     These patient cost-sharing responsibility amounts are calculated as a percentage or portion of the allowed amount.

52.     If a member receives a service from a provider that contracts to be part of Cigna's network (an "in-network" or "participating" provider), the plan pays the provider the amount that the provider agreed to accept its contracted network rate, and the member pays any applicable co-insurance, co-payments, and deductibles based on the coverage for in-network services specified in the member's plan.

53.     In exchange for agreeing to accept fixed, network rates for their services, participating providers receive certain benefits, including access to members of Cigna-administered plans as a source of patients.

54.     Just as it benefits participating providers, Cigna's network arrangements benefit employers and plan members by controlling overall health care costs and increasing the quality of medical care. In addition, members benefit from obtaining services from a participating provider because participating providers agree not to bill them for the difference between the plan's reimbursement to the participating provider and the provider's billed charges.

55.     In contrast, if a member receives a service from a provider who does not contract to be part of Cigna's provider network (an "out-of-network" or "non-participating" provider), the

provider can charge whatever it likes for its services—and out-of-network rates are generally higher than contracted rates—and the provider may bill the member for any portion of the provider's charges that the plan does not reimburse.

56.     To make out-of-network benefits an affordable option for the employers sponsoring them, Cigna's plans contain various financial incentives for members to choose participating providers and to share the increased costs associated with obtaining out-of-network services.

57.     One of the key ways in which Cigna's plans allocate out-of-network costs between employees and employers is through co-insurance—a percentage of the amount that the plan covers (or "allows") that the member is required to pay towards the cost of that service. The co-insurance that members must pay towards out-of-network services is usually much higher than the co-insurance they must pay (if any) towards in-network services.

58.     This co-insurance requirement underlies the entire concept of out-of-network benefits. It sensitizes members to the true costs of out-of-network services, ensuring that, if a member receives such a service, he is willing to pay a greater portion of that expense out of his own pocket. If patients did not share in these costs, then they would have no financial incentive to moderate their demand for out-of-network services or to consider the higher costs of any particular out-of-network provider, leading to increased costs for the plan.

59.     Similarly, without co-insurance requirements, out-of-network providers would have no incentive to not charge the plan astronomical rates, because the patients who choose to see the providers would not bear any more of the inflated cost.

60.     Cigna's plans have several mechanisms to ensure that members receiving out-of-network services pay their required co-insurance and that non-participating providers do not waive it.

61.     For instance, Cigna-administered plans state that they do not cover "charges which you [the member] are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan."  The language is representative of the language found in Cigna-administered plans.

62.     Here, for example, if an ASC submits "charges" of $10,000 to Cigna, but does not bill or require the patient to pay their applicable cost-sharing responsibility, the plan excludes coverage for the phantom charge.

63.     In addition, Cigna-administered plans generally limit reimbursement for out-of-network services to the "Maximum Reimbursable Charge" for "covered services," which can be no more than the "provider's normal charge for a similar service or supply," and explicitly exclude from coverage providers' charges "to the extent that they are more than Maximum Reimbursable Charges."

64.     Here, the inflated "charges" submitted to Cigna by the ASCs were not their "normal charge" for the services at issue, because these were not the charges that the ASCs actually charged to their patients. Rather, the "charges" submitted to Cigna were "phantom" charges, as some courts have referred to charges submitted by fee-forgiving providers.

65.     Further, Cigna-administered plans do not automatically cover or reimburse a member for every "charge" the provider submits to Cigna; rather, the plans cover a portion of any "Covered Expenses," which the plans define as "expenses incurred" by or on behalf of the member. Covered Expenses are in turn subject to the applicable co-insurance, co-payments, and deductibles set forth in the plans. Cigna-administered plans define co-insurance as "the percentage of charges for Covered Expenses that an insured person is *required* to pay under the plan." Thus, Cigna-

administered plans expressly require members to satisfy their cost-sharing responsibility (i.e. co-insurance, co-payments, and deductibles) in order for charges to be covered under the plans.

66.     As described below, at the time of service, the ASCs did not quote patients the "charges" submitted to Cigna. Instead, the ASCs charged patients much lower amounts in order to approximate "in-network" rates.

67.     Moreover, by promising Cigna plan members that in-network benefits would apply and that they would incur no additional out-of-pocket expenses above and beyond the ASCs' artificial cost share liability quoted to Cigna plan members, the ASCs foreclosed themselves from billing and collecting any additional amount of money.

68.     Courts have repeatedly held in the context of "fee forgiving" or "dual pricing schemes" that  healthcare plans do not cover a provider's "charges" when that provider does not collect the patient's applicable cost-sharing responsibilities. *See, e.g.*, *Kennedy v. Conn. Gen. Life Ins. Co.*, 924 F.2d 698, 701 (7th Cir. 1991); *Biomed Pharms., Inc. v. Oxford Health Plans (NY), Inc.*, 522 F. App'x 81, 81-82 (2d Cir. 2013).

69.     Any other interpretation would run contrary to the purpose of health insurance, which is to reimburse members for payments they actually make to providers, not to provide windfall payments to providers.

### *SurgCenter and the ASCs' Fraudulent Dual Pricing and Fee Forgiving Schemes*

70.     SurgCenter has developed a business model designed to game the healthcare system by submitting grossly inflated, phantom "charges" to Cigna that do not reflect the actual amount the ASCs bill patients.  SurgCenter implements this fraudulent scheme through each of the ASCs with which it partners.

71.     According to its website, SurgCenter "partners with local surgeons to create physician-owned and operated ambulatory surgical centers (ASC)."

72.     SurgCenter assists surgeons in forming the LLC and in the design and construction of the ambulatory surgical centers, including, upon information and belief, the Defendant ASCs here.

73.     SurgCenter then provides no-fee management and consulting services in managing and running the ambulatory surgical centers, including, upon information and belief, the Defendant ASCs here.

74.     According to its website, SurgCenter becomes "a vested partner that purchases 35% ownership" in each ambulatory surgical centers, including, upon information and belief, the Defendant ASCs here.

75.     SurgCenter has an ownership interest in approximately 119 ambulatory surgery centers throughout the United States, including the twenty Defendant ASCs.

76.     The Defendant ASCs have not joined Cigna's provider network, and thus are known as "out-of-network" or "non-participating" providers.

77.     The Defendant ASCs all employ a "dual pricing" and "fee forgiving" scheme. In other words, they entice members to their out-of-network facilities by billing them small amounts (or nothing at all), but charge the member's plan exorbitant, fraudulent amounts that bear no relation to the amounts the patients are charged.

78.     Each ASC then waives, or forgives, the proportion of the charges that the member owes based on the inflated charge that the ASC submits to the member's plan.

79.     Upon information and belief, all aspects of the fraudulent dual pricing schemes used by each ASC were designed and implemented at the direction of SurgCenter. Indeed, when

Cigna sent a letter to one of SurgCenter's other non-defendant ASC partners on May 26, 2011 regarding its billing practices, it was SurgCenter who responded on behalf of the ASC.

80. Specifically, on November 28, 2011, SurgCenter's Vice President of Managed Care and Revenue Cycle sent a letter back to Cigna referring to the dual pricing scheme as "an internal corporate policy" which SurgCenter represented the ASC followed. SurgCenter did not disclose that the ASC billed Cigna for a much higher charge than it billed the ASC's patients to calculate the patients' cost-sharing responsibility.

81. The following is a summary of the dual pricing and fee forgiving schemes used by SurgCenter and each of the ASCs.

82. First, each ASC promises patients that they will only be billed rates similar to what they would pay at an in-network facility, even though the ASCs are out-of-network facilities. An example of a notice provided to a patient by one of the ASCs is attached hereto as Exhibit A. The ASC then begins by quoting to the patient Medicare rates in order to approximate in-network rates.

83. Second, each ASC calculates the Cigna plan members' cost-sharing responsibility (e.g. co-payments, co-insurance, and deductibles) by applying the Cigna plan members' *in-network* benefits level to those estimated charges, even though the ASCs are out-of-network providers. Examples of the "Insurance Verification" and "Calculation of Patient Responsibility" sheets used by the ASCs to calculate patient responsibility are attached hereto as Exhibits B and C.

84. Upon information and belief, SurgCenter creates the Insurance Verification sheet and Calculation of Patient Responsibility templates, as well as the claim forms submitted to Cigna by the ASCs. These documents are created by SurgCenter and provided to the ASCs as part of the scheme to defraud insurers such as Cigna.

17

85.     <u>Third</u>, each ASC promises the Cigna plan members that they will not have to bear any additional out-of-pocket expenses beyond what the ACSs have artificially calculated as the members' cost share liability based on the members' in-network benefits level using Medicare rates. As a result, each ASC waives the applicable out-of-network co-insurance, co-payment, and deductible amounts that Cigna plan members must pay out-of-network providers like the ASCs under Cigna-administered health benefit plans.

86.     <u>Fourth</u>, each ASC submits claim forms to Cigna based on a separate fee schedule with charges fraudulently inflated by as much as tens of thousands of dollars over the Medicare-based prices that the ASCs quoted to the Cigna plan members. An example of the fraudulent claim forms submitted to Cigna is attached hereto as Exhibit D. The "charges" submitted to Cigna by the ASCs are phantom charges, as the ASCs do not collect, and never intend to collect, the full amounts that they put on the forms; they intend to collect much less, if anything at all.

87.     Through the scheme described above, each ASC misrepresented its actual charges for the services rendered to Cigna affirmatively and through omission. As a result, Cigna relied on the amount that the ASCs billed to Cigna in their claim forms when processing and paying the ASCs' claims.

88.     The purpose of this scheme was to entice Cigna plan members to use the ASCs' out-of-network surgical centers so that Cigna would reimburse the ASCs for their grossly inflated rates. Given their exorbitant charges, the ASCs and SurgCenter recognized that Cigna's plan members would not use, and likely could not afford to use, the ASCs' facilities if the ASCs billed and collected the applicable out-of-network cost share responsibility from Cigna plan members, which would have required out-of-pocket payments from Cigna plan members that totaled thousands, if not tens of thousands, of dollars. Therefore, the ASCs waived the required out-of-

network co-insurance, co-payment, and deductible amounts members were obligated to pay under their plans.

89.    Further, each ASC knowingly misrepresented to patients that the patients could use their "in-network" benefits at the ASCs even though the ASCs were out-of-network facilities.

90.    Indeed, the ASCs further harmed Cigna patients by leading the patients to believe that their cost-share payments would accumulate toward their in-network cost-share totals (e.g. deductibles), which they did not, as the ASCs were out of network. Thus, due to the ASCs' fraudulent practices, the Cigna patients would potentially pay more out of pocket for future in-network health care services.

91.    The ASCs also never fully disclosed the true nature, extent and scope of their cost share waiver and dual pricing schemes to Cigna.

92.    Indeed, while the ASCs noted in the claim forms submitted to Cigna that "[t]he insured's portion of this bill has been reduced in amount so the patient's responsibility for the deductible and copay amount is billed at in network rates," nothing in the claims forms either revealed or explained how their charges were computed or disclosed that the ASCs had not charged their patients for the same amounts that it submitted to Cigna for reimbursement.

93.    In addition, by stating that "[t]he insured's portion of ***this bill*** has been reduced," the ASCs and SurgCenter affirmatively sought to mislead Cigna into believing that it charged the patient and Cigna and its client a single, common price.

94.    Only through its own internal investigation did Cigna learn the existence of the ASCs' dual pricing and fee forgiving schemes.

95.    The following are examples of the fraudulent dual pricing and fee-forgiving schemes employed by the ASCs:

- Hagerstown Surgery Center LLC sent a claim form to Cigna listing $28,606.88 as its charges for services rendered to a Cigna member. This member had an out-of-network co-insurance responsibility of 20 percent, compared to an in-network co-insurance responsibility of 5 percent. Through an internal investigation, Cigna discovered that Hagerstown quoted to the patient a charge of only $5,787.50, or approximately one fifth of the amount charged to Cigna. Hagerstown then applied the members' *in-network* co-insurance, co-payment, and deductible levels to this already much-lower amount, resulting in Hagerstown charging the patient only $431.88, which was a small fraction of the patient's cost-sharing responsibility under his or her plan.

- Advanced Surgery Center of Bethesda LLC sent a claim form to Cigna listing $20,960.50 as its charges for services rendered to a Cigna member. This member had an out-of-network co-insurance responsibility of 30 percent, compared to an in-network co-insurance responsibility of 10 percent. Through an internal investigation, Cigna discovered that Hagerstown quoted to the patient a charge of only $4,080.00, or less than one fifth of the amount charged to Cigna. Advanced Surgery Center of Bethesda LLC then applied the members' in-network co-insurance, co-payment, and deductible levels to this already much-lower amount, resulting in the ASC charging the patient only $960.00, which was a small fraction of the patient's cost-sharing responsibility under his or her plan.

- Riva Road Surgical Center sent a claim form to Cigna listing $9,907.00 as its charges for services rendered to a Cigna member. Relying on this claim form, Cigna paid Riva Road Surgical Center $3,369.82. The patient's plan required the patient to pay $4,555.78. But through an internal investigation, Cigna later discovered that Riva Road Surgical Center charged the patient only $90.77.

- Riva Road Surgical Center also sent a claim form to Cigna listing $17,873.00 as its charges for services rendered to a Cigna member. Relying on this claim form, Cigna paid Riva Road Surgical Center $7,248.39. The patient's plan required the patient to pay $7,050.01. But through an internal investigation, Cigna later discovered that Riva Road Surgical Center charged the patient only $375.00.

96.     Upon information and belief, every claim submitted to Cigna by the Defendant ASCs follows the fee-forgiving pattern described above.

97.     After Advanced Surgery Center of Bethesda was established in 2012, it began submitting fraudulent claim forms to Cigna pursuant to the fee-forgiving scheme described above. As a result of Defendants' fraudulent scheme, from 2013 to present Cigna has paid Advanced Surgery Center of Bethesda $379,023.47.

98.     After Bethesda Chevy Chase Surgery Center was established in 2010, it began submitting fraudulent claim forms to Cigna pursuant to the fee-forgiving scheme described above. As a result of Defendants' fraudulent scheme, from 2011 to present Cigna has paid Bethesda Chevy Chase Surgery Center $2,974,918.76.

99.     After Deer Pointe Surgical Center was established in 2010, it began submitting fraudulent claim forms to Cigna pursuant to the fee-forgiving scheme described above. As a result of Defendants' fraudulent scheme, from 2011 to present Cigna has paid Deer Pointe Surgical Center $579,317.40.

100.     After Hagerstown Surgery Center was established in 2010, it began submitting fraudulent claim forms to Cigna pursuant to the fee-forgiving scheme described above. As a result of Defendants' fraudulent scheme, from 2011 to present Cigna has paid Hagerstown Surgery Center $1,167,364.24.

101.     After Leonardtown Surgery Center was established in 2011, it began submitting fraudulent claim forms to Cigna pursuant to the fee-forgiving scheme described above. As a result of Defendants' fraudulent scheme, from 2012 to present Cigna has paid Leonardtown Surgery Center $305,633.73.

102.     After Maple Lawn Surgery Center was established in 2009, it began submitting fraudulent claim forms to Cigna pursuant to the fee-forgiving scheme described above. As a result of Defendants' fraudulent scheme, from 2011 to present Cigna has paid Maple Lawn Surgery Center $1,202,576.09.

103.     After Maryland Specialty Surgery Center was established in 2012, it began submitting fraudulent claim forms to Cigna pursuant to the fee-forgiving scheme described above.

As a result of Defendants' fraudulent scheme, from 2013 to present Cigna has paid Maryland Specialty Surgery Center $69,760.39.

104.    After Monocacy Surgery Center was established in 2014, it began submitting fraudulent claim forms to Cigna pursuant to the fee-forgiving scheme described above. As a result of Defendants' fraudulent scheme, Cigna has paid Monocacy Surgery Center $18,385.26.

105.    After Piccard Surgery Center was established in 2009, it began submitting fraudulent claim forms to Cigna pursuant to the fee-forgiving scheme described above. As a result of Defendants' fraudulent scheme, from 2011 through the present Cigna has paid Piccard Surgery Center $3,148,250.78.

106.    After Riva Road Surgical Center was established in 2007, it began submitting fraudulent claim forms to Cigna pursuant to the fee-forgiving scheme described above. As a result of Defendants' fraudulent scheme, from 2011 through the present Cigna has paid Riva Road Surgical Center $2,142,618.04.

107.    After SurgCenter at National Harbor LLC d/b/a Harborside Surgery Center was established in 2011, it began submitting fraudulent claim forms to Cigna pursuant to the fee-forgiving scheme described above. As a result of Defendants' fraudulent scheme, from 2013 to present Cigna has paid SurgCenter at National Harbor LLC d/b/a Harborside Surgery Center $686,981.65.

108.    After SurgCenter of Glen Burnie was established in 2009, it began submitting fraudulent claim forms to Cigna pursuant to the fee-forgiving scheme described above. As a result of Defendants' fraudulent scheme, from 2011 through the present Cigna has paid SurgCenter of Glen Burnie $1,973,482.20.

109.    After SurgCenter of Greenbelt was established in 2010, it began submitting fraudulent claim forms to Cigna pursuant to the fee-forgiving scheme described above. As a result of Defendants' fraudulent scheme, from 2011 to present Cigna has paid SurgCenter of Greenbelt $1,004,953.12.

110.    After SurgCenter of Silver Spring was established, it began submitting fraudulent claim forms to Cigna pursuant to the fee-forgiving scheme described above. As a result of Defendants' fraudulent scheme, from 2012 to present Cigna has paid SurgCenter of Silver Spring $221,886.55.

111.    After SurgCenter of Southern Maryland was established in 2009, it began submitting fraudulent claim forms to Cigna pursuant to the fee-forgiving scheme described above. As a result of Defendants' fraudulent scheme, from 2011 to present Cigna has paid SurgCenter of Southern Maryland $1,466,357.45.

112.    After SurgCenter of Western Maryland was established in 2011, it began submitting fraudulent claim forms to Cigna pursuant to the fee-forgiving scheme described above. As a result of Defendants' fraudulent scheme, from 2011 to present Cigna has paid SurgCenter of Western Maryland $157,832.67.

113.    After SurgCenter of White Marsh was established in 2011, it began submitting fraudulent claim forms to Cigna pursuant to the fee-forgiving scheme described above. As a result of Defendants' fraudulent scheme, from 2011 to present Cigna has paid SurgCenter of White Marsh $1,286,496.22.

114.    After Timonium Surgery Center was established in 2009, it began submitting fraudulent claim forms to Cigna pursuant to the fee-forgiving scheme described above. As a result

of Defendants' fraudulent scheme, from 2011 through the present Cigna has paid Timonium Surgery Center $1,684,268.27.

115.    After Upper Bay Surgery Center was established in 2008, it began submitting fraudulent claim forms to Cigna pursuant to the fee-forgiving scheme described above. As a result of Defendants' fraudulent scheme, from 2009 through the present Cigna has paid Upper Bay Surgery Center $118,560.06.

116.    After Windsor Mill Surgery Center was established in 2013, it began submitting fraudulent claim forms to Cigna pursuant to the fee-forgiving scheme described above. As a result of Defendants' fraudulent scheme, from 2013 to present Cigna has paid Windsor Mill Surgery Center $6,875.16.

### *SurgCenter and the ASCs' Additional Fraudulent Conduct*

117.    Through its own internal investigations, Cigna discovered the fraudulent schemes described above and began denying claims for benefits submitted by the ASCs. Cigna informed the Defendant ASCs that Cigna was aware of their fraudulent billing practices. Cigna further requested that the ASCs cease and desist their fraudulent practices immediately, and that until Cigna had sufficient evidence that the ASCs had stopped their fraudulent practices, Cigna would deny the ASCs' claims. The ASCs not only refused to cease and desist their fraudulent billing practices, but failed to disclose to Cigna customers that the ASCs' billing practices could jeopardize the patients' coverage.

118.    After Cigna began disputing the ASCs' claims, certain ASCs have engaged in additional fraudulent conduct in an effort to further mislead Cigna and its clients regarding the ASCs' billing practices.

119.    Specifically, the ASCs agreed with patients at or about the time of service that the patients would not have to pay anything more than the "in-network" Medicare-based rates that the ASCs quoted to the patients, foreclosing the ASCs from billing the patients any additional amounts.

120.    Despite these prior assurances to patients that they would not be billed for any additional amounts by the ASCs, after Cigna began disputing the ASCs' claims, the ASCs have begun sending communications to patients suggesting that they may bill the patients for additional amounts. An example of the letter sent by the ASCs to patients is attached hereto as Exhibit E.

121.    Put simply, these after-the-fact attempts by the ASCs to bill their patients are a sham.

122.    It is clear that the ASCs have no intention of collecting any additional amounts from their patients. Indeed, patients have informed Cigna that the ASCs have assured the patients that they will not actually have to pay the amounts in the ASCs' bills. For example, one patient who received one of these communications from SurgCenter at National Harbor LLC d/b/a Harborside Surgery Center ("Harborside") followed up with the ASC, as well as the office of the doctor who performed the patients' surgery, Dr. Wolff. The patient reported that Dr. Wolff assured the patient would "not have to pay this bill." A representative of Dr. Wolff's office later confirmed to the patient "We did promise you that we would accommodate you financially and that promise has not been broken. . . . Until you receive a bill from [the doctor], or Harborside, you cannot worry."

123.    Likewise, Bethesda Chevy Chase Surgery Center has sent similar after-the-fact letters to patients, suggesting that the ASC may charge their patients additional amounts as a result of the billing dispute with Cigna. One patient, after receiving such a letter, followed up with

Bethesda Chevy Chase Surgery Center. The patient reported that "the provider's representative expressly assured me that they are not pursuing collection of any of the large bills that they say Cigna is requiring them to send."

124.    Thus, the ASCs have sent these communications to patients in a transparent attempt to mislead Cigna into believing that the ASCs are holding patients responsible for charges that the ASCs previously promised patients they would not have to pay.

125.    Indeed, even on the face of the letters, it is clear that the ASCs are not actually seeking to collect additional payments from its patients. Specifically, the letters sent by the ASCs inform patients that the ASCs "continue to have discussions with Cigna about these issues . . . so that we will not have to collect the balance due from you for your medical treatment." (*See* Ex. E.)

126.    Further, after the billing dispute between Cigna and the ASCs began, the ASCs have refused to provide Cigna and the ASCs' patients with information about the ASCs' billing practices in an attempt to further conceal the ASCs' billing practices. For example, on June 24, 2014, a patient who received services at SurgCenter at National Harbor LLC d/b/a Harborside Surgery Center ("Harborside") requested that Harborside provide copies of the forms that the patient signed indicating how Harborside calculated the patient's cost-sharing responsibility. Harborside's Business Office Manager, Deirdre Gomer, responded by stating "this is information that we do not give to patients." The patient followed up, asking why the patient would not be able to see the amounts charged for his or her own claim. Ms. Gomer responded:  "That is proprietary information that we do not give out to patients."

## CAUSES OF ACTION

### Count I – Claim for Overpayments Under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) (Against All ASCs)

127.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

128.     Cigna is a fiduciary of the ASO and fully-insured plans that it administers and seeks to recover overpayments made by those plans to the ASCs.

129.     The ASCs did not require plan members to pay the full amount of the charges they listed in claims forms submitted to Cigna for reimbursement on behalf of the members' plans.

130.     The ASCs did not require plan members to pay the full amount of the plan members' out-of-network cost sharing responsibility under the terms of their plans.

131.     The ASCs' patients' plans, however, expressly do not cover any portion of the charges that providers like the ASCs do not require plan members to pay, nor do they require the plan to cover anything in excess of the ASCs' normal charges to its patients.

132.     By paying the ASCs amounts that the ASCs did not charge plan members, these plans made overpayments to the ASCs.

133.     These overpayments were made directly by Cigna to the ASCs.

134.     These overpayments belong in good conscience to the plans because the plans managed by Cigna made benefit payments to the ASCs for services provided to plan members based on the fraudulent charges that the ASCs listed on the claim forms that they submitted to Cigna.

135.     These overpayments are within the possession and control of the Defendants.

136.     These overpayments were made in contravention of plan terms.

137.     Cigna seeks recovery of these overpayments on behalf of the plans. Alternatively, Cigna seeks a declaration that it may offset from future claim payments to the ASCs in the amount of these overpayments.

138.     Additionally, Cigna seeks a permanent injunction directing all of the ASCs to submit to Cigna only charges that the ASC actually charges the plan member as payment in full

27

for the ASCs' services and not to submit charges which include amounts that the ASC does not actually require the member to pay (including, without limitation, the waiver of any portion of the members' required out-of-network co-insurance, co-payment, and deductible amounts).

### Counts II.A-II.T – RICO, 18 U.S.C. § 1962(c)
### (Against All Defendants)

139.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

140.    <u>The Enterprises</u>. The following allegations are made upon information and belief. SurgCenter entered into twenty separate two-party association-in-fact enterprises with each of the twenty ASCs. SurgCenter came to agreements with each of the ASCs to create the enterprises, the purpose of which is to operate for-profit medical centers and thereby enrich the enterprise's members by luring Cigna plan members to use these out-of-network centers through misrepresentations about the centers' costs to plan members, Cigna, and their plans. SurgCenter's role in each of the twenty enterprises was to invest in the ASC and provide operational support to the ASC. Among other things, SurgCenter developed the dual pricing scheme described above (*see* ¶¶ 70-96), and directed the ASCs to follow the dual pricing scheme, which each of the twenty ASCs agreed to do. SurgCenter also provided each ASC with the sample language to include on claim forms submitted to managed care companies like Cigna, as well as the patient responsibility calculation forms, such as the forms attached hereto as Exhibits B and C. Each of the ASCs' role in the twenty enterprises was to, among other things: 1) lure patients to their facilities by misleading the patients into believing that they could use their "in-network" benefits at the ASC, 2) treat patients at the facilities and charge the patients little or nothing for the ASCs' services, and 3) submit exorbitant, fraudulent charges to managed care companies like Cigna in order to induce Cigna and other managed care companies into paying the ASCs based on these fraudulent charges.

At the direction of, and in coordination with, SurgCenter, each of the twenty Defendant ASCs followed the practices outlined in Paragraphs 70 through 96 above.

141.     <u>The RICO Schemes</u>. The following allegations are made upon information and belief. SurgCenter and each individual ASC each developed separate fraudulent dual pricing and fee forgiving schemes (the "RICO Schemes") as described above.  (*See* ¶¶ 70-96, 140.)

142.     <u>The Pattern of Racketeering Activity</u>. The following allegations are made upon information and belief. Each of the ASCs and SurgCenter actively participate and participated in the conduct and operation of the respective two-party enterprises by participating in each stage of the RICO Schemes, as described above.  (*See* ¶¶ 70-96, 140-41.)

143.     SurgCenter partnered with each of the ASCs to develop ambulatory surgical centers, and then provided no-fee management and consulting services in managing and running each of the ASCs, and takes a 35% ownership share in each of the ASCs. As described above, as part of this scheme, each of the ASCs, with the assistance and guidance of SurgCenter, submits fraudulent claim forms to insurers like Cigna in order to induce the insurers to make payments to the ASCs.

144.     As part of these schemes, each of the ASCs then funnels a portion of the fraudulently-obtained money paid by insurers like Cigna back to SurgCenter.

145.     Upon information and belief, in furtherance of the RICO Schemes, each ASC has submitted and continues to submit false claims to other insurers as well as Cigna, including those claims described above.

146.     SurgCenter and each ASC knew that Cigna would reasonably rely on the falsely-stated charges in these forms when Cigna processed benefit payments for the services listed on the forms and therefore pay the ASC its inflated, out-of-network rates.

147.    Each ASC took further steps to conceal the true nature of its fraudulently inflated charges to Cigna by, for instance, misrepresenting to patients that they could use their "in-network" benefits at the respective ASC, and by refusing Cigna's requests to provide information regarding the ASCs' billing practices. Only through its extensive investigations did Cigna discover the RICO Schemes.

148.    Each of the Defendant ASCs has submitted many fraudulent claim forms to Cigna, with some of the Defendant ASCs having submitted hundreds of fraudulent claim forms to Cigna. An example of the fraudulent claim form is attached hereto as Exhibit D.

149.    Each time the ASC submitted such a form to Cigna by mail, it committed a separate act of mail fraud in violation of 18 U.S.C. § 1341.

150.    Each time each ASC submitted such a form to Cigna using the interstate wires, it committed a separate act of wire fraud in violation of 18 U.S.C. § 1343.

151.    Each ASC committed these acts of mail and wire fraud at the direction of and in coordination with SurgCenter.

152.    Indeed, when Cigna contacted one of SurgCenter's other non-defendant ASC partners, Westminster Surgery Center, regarding its billing practices, SurgCenter responded on the ASC's behalf.  SurgCenter's Vice President of Managed Care and Revenue Cycle referred to the dual pricing scheme as "an internal corporate policy" with which SurgCenter represented Westminster had followed.

153.    By submitting thousands of these forms over the past several years, SurgCenter and each ASC engaged in a pattern of racketeering activity, one that continues now.  The direct and intended victims of this pattern of racketeering activity are Cigna and entities that sponsor Cigna's ASO plans.

154.    As a direct result of the ASCs' fraudulent claim submissions, Cigna paid the ASCs more than $20 million from its own funds and the funds of the plans it administers.

155.    Thus, a result of the conduct by SurgCenter and the ASCs, Cigna and its ASO plan sponsors have been injured in an amount to be determined at trial.

156.    Pursuant to 18 U.S.C. § 1964(c), Cigna and its ASO plan sponsors are entitled to recover threefold their damages, costs, and attorneys' fees. In addition, they are entitled to injunctive relief to enjoin SurgCenter and each of the ASCs' ongoing racketeering activity.

### Count II.A. -- RICO, 18 U.S.C. § 1962(c)
### (Against SurgCenter and Advanced Surgery Center of Bethesda)

157.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

158.    No later than 2012, SurgCenter and Advanced Surgery Center of Bethesda entered into a two-party enterprise (the "SurgCenter-Advanced Surgery Enterprise") to engage in the actions described in Paragraphs 70-96, 140-56. As part of the RICO Scheme, Advanced Surgery Center of Bethesda, acting on behalf of the SurgCenter-Advanced Surgery Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Exhibit F.

159.    Upon information and belief, in each instance the SurgCenter-Advanced Surgery Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that Advanced Surgery Center of Bethesda charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Advanced Surgery Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts. Pursuant to the RICO Scheme

described above, the SurgCenter-Advanced Surgery Enterprise fraudulently induced Cigna into making at least $379,023.47 in payments to Advanced Surgery Center of Bethesda.

### Count II.B. -- RICO, 18 U.S.C. § 1962(c)
### (Against SurgCenter and Bethesda Chevy Chase Surgery Center)

160.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

161.    No later than 2010, SurgCenter and Bethesda Chevy Chase Surgery Center entered into a two-party enterprise (the "SurgCenter-Bethesda Enterprise") to engage in the actions described in Paragraphs 70-96, 140-56. As part of the RICO Scheme, Bethesda Chevy Chase Surgery Center, acting on behalf of the SurgCenter-Bethesda Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Exhibit G.

162.    Upon information and belief, in each instance the SurgCenter-Bethesda Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that Bethesda Chevy Chase Surgery Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Bethesda Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts. Pursuant to the RICO Scheme described above, the SurgCenter-Bethesda Enterprise fraudulently induced Cigna into making at least $2,974,918.76 in payments to Bethesda Chevy Chase Surgery Center.

### Count II.C. -- RICO, 18 U.S.C. § 1962(c)
### (Against SurgCenter and Deer Pointe Surgical Center)

163.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

164.    No later than 2010, SurgCenter and Deer Pointe Surgical Center entered into a two-party enterprise (the "SurgCenter-Deer Pointe Enterprise") to engage in the actions described in

Paragraphs 70-96, 140-56. As part of the RICO Scheme, Deer Pointe Surgical Center, acting on behalf of the SurgCenter-Deer Pointe Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Exhibit H.

165.    Upon information and belief, in each instance the SurgCenter-Deer Pointe Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that Deer Pointe Surgical Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Deer Pointe Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts. Pursuant to the RICO Scheme described above, the SurgCenter-Deer Pointe fraudulently induced Cigna into making at least $579,317.40 in payments to Deer Pointe Surgical Center.

### Count II.D. -- RICO, 18 U.S.C. § 1962(c)
### (Against SurgCenter and Hagerstown Surgery Center)

166.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

167.    No later than 2010, SurgCenter and Hagerstown Surgery Center entered into a two-party enterprise (the "SurgCenter-Hagerstown Enterprise") to engage in the actions described in Paragraphs 70-96, 140-56. As part of the RICO Scheme, Hagerstown Surgery Center, acting on behalf of the SurgCenter-Hagerstown Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Exhibit I.

33

168.    Upon information and belief, in each instance the SurgCenter-Hagerstown Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that Hagerstown Surgery Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Hagerstown Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts. Pursuant to the RICO Scheme described above, the SurgCenter-Hagerstown Enterprise fraudulently induced Cigna into making at least $1,167,364.24 in payments to Hagerstown Surgery Center.

### Count II.E. -- RICO, 18 U.S.C. § 1962(c)
### (Against SurgCenter and Leonardtown Surgery Center)

169.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

170.    No later than 2011, SurgCenter and Leonardtown Surgery Center entered into a two-party enterprise (the "SurgCenter-Leonardtown Enterprise") to engage in the actions described in Paragraphs 70-96, 140-56. As part of the RICO Scheme, Leonardtown Surgery Center, acting on behalf of the SurgCenter-Leonardtown Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Exhibit J.

171.    Upon information and belief, in each instance the SurgCenter-Leonardtown Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that Leonardtown Surgery Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Leonardtown Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts. Pursuant to the RICO Scheme described

above, the SurgCenter-Leonardtown Enterprise fraudulently induced Cigna into making at least $305,633.73 in payments to Leonardtown Surgery Center.

### Count II.F. -- RICO, 18 U.S.C. § 1962(c)
### (Against SurgCenter and Maple Lawn Surgery Center)

172.   The preceding paragraphs are incorporated by reference as if set forth fully herein.

173.   No later than 2009, SurgCenter and Maple Lawn Surgery Center entered into a two-party enterprise (the "SurgCenter-Maple Lawn Enterprise") to engage in the actions described in Paragraphs 70-96, 140-56. As part of the RICO Scheme, Maple Lawn Surgery Center, acting on behalf of the SurgCenter-Maple Lawn Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Exhibit K.

174.   Upon information and belief, in each instance the SurgCenter-Maple Lawn Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that Maple Lawn Surgery Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Maple Lawn Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts. Pursuant to the RICO Scheme described above, the SurgCenter-Maple Lawn Enterprise fraudulently induced Cigna into making at least $1,202,576.09 in payments to Maple Lawn Surgery Center.

### Count II.G. -- RICO, 18 U.S.C. § 1962(c)
### (Against SurgCenter and Maryland Specialty Surgery Center)

175.   The preceding paragraphs are incorporated by reference as if set forth fully herein.

176.   No later than 2012, SurgCenter and Maryland Specialty Surgery Center entered into a two-party enterprise (the "SurgCenter-Maryland Specialty Enterprise") to engage in the

actions described in Paragraphs 70-96, 140-56. As part of the RICO Scheme, Maryland Specialty Surgery Center, acting on behalf of the SurgCenter-Maryland Specialty Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Exhibit L.

177.    Upon information and belief, in each instance the SurgCenter-Maryland Specialty Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that Maryland Specialty Surgery Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Maryland Specialty Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts. Pursuant to the RICO Scheme described above, the SurgCenter-Maryland Specialty Enterprise fraudulently induced Cigna into making $69,760.39 in payments to Maryland Specialty Surgery Center.

### Count II.H. -- RICO, 18 U.S.C. § 1962(c)
### (Against SurgCenter and Monocacy Surgery Center)

178.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

179.    No later than 2014, SurgCenter and Monocacy Surgery Center entered into a two-party enterprise (the "SurgCenter-Monocacy Enterprise") to engage in the actions described in Paragraphs 70-96, 140-56. As part of the RICO Scheme, Monocacy Surgery Center, acting on behalf of the SurgCenter-Monocacy Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Exhibit M.

180.    Upon information and belief, in each instance the SurgCenter-Monocacy Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that Monocacy Surgery Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Monocacy Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts. Pursuant to the RICO Scheme described above, the SurgCenter-Monocacy Enterprise fraudulently induced Cigna into making at least $18,385.26 in payments to Monocacy Surgery Center.

### Count II.I. -- RICO, 18 U.S.C. § 1962(c)
### (Against SurgCenter and Piccard Surgery Center)

181.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

182.    No later than 2009, SurgCenter and Piccard Surgery Center entered into a two-party enterprise (the "SurgCenter-Piccard Enterprise") to engage in the actions described in Paragraphs 70-96, 140-56. As part of the RICO Scheme, Piccard Surgery Center, acting on behalf of the SurgCenter-Piccard Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Exhibit N.

183.    Upon information and belief, in each instance the SurgCenter-Piccard Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that Piccard Surgery Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Piccard Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts. Pursuant to the RICO Scheme described above, the

SurgCenter-Piccard Enterprise fraudulently induced Cigna into making at least $3,148,250.78 in payments to Piccard Surgery Center.

## Count II.J. -- RICO, 18 U.S.C. § 1962(c)
### (Against SurgCenter and Riva Road Surgical Center)

184.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

185.    No later than 2007, SurgCenter and Riva Road Surgical Center entered into a two-party enterprise (the "SurgCenter-Riva Road Enterprise") to engage in the actions described in Paragraphs 70-96, 140-56. As part of the RICO Scheme, Riva Road Surgical Center, acting on behalf of the SurgCenter-Riva Road Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Exhibit O.

186.    Upon information and belief, in each instance the SurgCenter-Riva Road Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that Riva Road Surgical Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Riva Road Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts. Pursuant to the RICO Scheme described above, the SurgCenter-Riva Road Enterprise fraudulently induced Cigna into making at least $2,142,618.04 in payments to Riva Road Surgical Center.

## Count II.K. -- RICO, 18 U.S.C. § 1962(c)
### (Against SurgCenter and National Harbor LLC d/b/a Harborside Surgery Center)

187.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

188.    No later than 2010, SurgCenter and National Harbor LLC d/b/a Harborside Surgery Center entered into a two-party enterprise (the "SurgCenter-Harborside Enterprise") to engage in

the actions described in Paragraphs 70-96, 140-56. As part of the RICO Scheme, National Harbor

LLC d/b/a Harborside Surgery Center, acting on behalf of the SurgCenter-Harborside Enterprise,

submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted

false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including,

but not limited to, claims submitted on or about the dates and in the amounts set forth in Exhibit

P.

189.     Upon information and belief, in each instance the SurgCenter-Harborside

Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna

were not the actual amounts that National Harbor LLC d/b/a Harborside Surgery Center charged

to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The

members of the SurgCenter-Hagerstown Enterprise submitted these claims to Cigna intending for

Cigna to reimburse the surgery center based on the higher, inflated amounts. Pursuant to the RICO

Scheme described above, the SurgCenter-Harborside Enterprise fraudulently induced Cigna into

making at least $686,981.65 in payments to National Harbor LLC d/b/a Harborside Surgery

Center.

### Count II.L. -- RICO, 18 U.S.C. § 1962(c)
### (Against SurgCenter and SurgCenter of Glen Burnie)

190.     The preceding paragraphs are incorporated by reference as if set forth fully herein.

191.     No later than 2009, SurgCenter and SurgCenter of Glen Burnie entered into a two-

party enterprise (the "SurgCenter-Glen Burnie Enterprise") to engage in the actions described in

Paragraphs 70-96, 140-56. As part of the RICO Scheme, SurgCenter of Glen Burnie, acting on

behalf of the SurgCenter-Glen Burnie Enterprise, submitted false claims forms to Cigna by mail

in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate

wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Exhibit Q.

192.    Upon information and belief, in each instance the SurgCenter-Glen Burnie Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that SurgCenter of Glen Burnie charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Glen Burnie Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts. Pursuant to the RICO Scheme described above, the SurgCenter-Glen Burnie Enterprise fraudulently induced Cigna into making at least $1,973,482.20 in payments to SurgCenter of Glen Burnie.

### Count II.M. -- RICO, 18 U.S.C. § 1962(c)
### (Against SurgCenter and SurgCenter of Greenbelt)

193.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

194.    No later than 2010, SurgCenter and SurgCenter of Greenbelt entered into a two-party enterprise (the "SurgCenter-Greenbelt Enterprise") to engage in the actions described in Paragraphs 70-96, 140-56. As part of the RICO Scheme, SurgCenter of Greenbelt, acting on behalf of the SurgCenter-Greenbelt Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Exhibit R.

195.    Upon information and belief, in each instance the SurgCenter-Greenbelt Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that SurgCenter of Greenbelt charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Greenbelt

Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts. Pursuant to the RICO Scheme described above, the SurgCenter-Greenbelt Enterprise fraudulently induced Cigna into making at least $1,004,953.12 in payments to SurgCenter of Greenbelt.

### Count II.N. -- RICO, 18 U.S.C. § 1962(c)
#### (Against SurgCenter and SurgCenter of Silver Spring)

196.     The preceding paragraphs are incorporated by reference as if set forth fully herein.

197.     No later than 2012, SurgCenter and SurgCenter of Silver Spring entered into a two-party enterprise (the "SurgCenter-Silver Spring Enterprise") to engage in the actions described in Paragraphs 70-96, 140-56. As part of the RICO Scheme, SurgCenter of Silver Spring, acting on behalf of the SurgCenter-Silver Spring Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Exhibit S.

198.     Upon information and belief, in each instance the SurgCenter-Silver Spring Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that SurgCenter of Silver Spring charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Silver Spring Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts. Pursuant to the RICO Scheme described above, the SurgCenter-Silver Spring fraudulently induced Cigna into making at least $221,886.55 in payments to SurgCenter of Silver Spring.

### Count II.O. -- RICO, 18 U.S.C. § 1962(c)
#### (Against SurgCenter and SurgCenter of Southern Maryland)

199.     The preceding paragraphs are incorporated by reference as if set forth fully herein.

200.    No later than 2009, SurgCenter of Southern Maryland entered into a two-party enterprise (the "SurgCenter-Southern Maryland Enterprise") to engage in the actions described in Paragraphs 70-96, 140-56. As part of the RICO Scheme, SurgCenter of Southern Maryland, acting on behalf of the SurgCenter-Southern Maryland Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Exhibit T.

201.    Upon information and belief, in each instance the SurgCenter-Southern Maryland Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that SurgCenter of Southern Maryland charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Southern Maryland Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts. Pursuant to the RICO Scheme described above, the SurgCenter-Southern Maryland Enterprise fraudulently induced Cigna into making at least $1,466,357.45 in payments to SurgCenter of Southern Maryland.

**Count II.P. -- RICO, 18 U.S.C. § 1962(c)**
**(Against SurgCenter and SurgCenter of Western Maryland)**

202.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

203.    No later than 2011, SurgCenter and SurgCenter of Western Maryland entered into a two-party enterprise (the "SurgCenter-Western Maryland Enterprise") to engage in the actions described in Paragraphs 70-96, 140-56. As part of the RICO Scheme, SurgCenter of Western Maryland, acting on behalf of the SurgCenter-Western Maryland Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim

forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Exhibit U.

204.    Upon information and belief, in each instance the SurgCenter-Western Maryland Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that SurgCenter of Western Maryland charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Western Maryland Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts. Pursuant to the RICO Scheme described above, the SurgCenter-Western Maryland Enterprise fraudulently induced Cigna into making at least $157,832.67 in payments to SurgCenter of Western Maryland.

### Count II.Q. -- RICO, 18 U.S.C. § 1962(c)
### (Against SurgCenter and SurgCenter of White Marsh)

205.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

206.    No later than 2011, SurgCenter and SurgCenter of White Marsh entered into a two-party enterprise (the "SurgCenter-White Marsh Enterprise") to engage in the actions described in Paragraphs 70-96, 140-56. As part of the RICO Scheme, SurgCenter of White Marsh, acting on behalf of the SurgCenter-White Marsh Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Exhibit V.

207.    Upon information and belief, in each instance the SurgCenter-White Marsh Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that SurgCenter of White Marsh charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-

White Marsh Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts. Pursuant to the RICO Scheme described above, the SurgCenter-White Marsh Enterprise fraudulently induced Cigna into making at least $1,286,496.22 in payments to SurgCenter of White Marsh.

### Count II.R. -- RICO, 18 U.S.C. § 1962(c)
### (Against SurgCenter and Timonium Surgery Center)

208.     The preceding paragraphs are incorporated by reference as if set forth fully herein.

209.     No later than 2009, SurgCenter and Timonium Surgery Center entered into a two-party enterprise (the "SurgCenter-Timonium Enterprise") to engage in the actions described in Paragraphs 70-96, 140-56. As part of the RICO Scheme, Timonium Surgery Center, acting on behalf of the SurgCenter-Timonium Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Exhibit W.

210.     Upon information and belief, in each instance the SurgCenter-Timonium Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that Timonium Surgery Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Timonium Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts. Pursuant to the RICO Scheme described above, the SurgCenter-Timonium Enterprise fraudulently induced Cigna into making at least $1,684,268.27 in payments to Timonium Surgery Center.

### Count II.S. -- RICO, 18 U.S.C. § 1962(c)
### (Against SurgCenter and Upper Bay Surgery Center)

211.     The preceding paragraphs are incorporated by reference as if set forth fully herein.

212.    No later than 2008, SurgCenter and Upper Bay Surgery Center entered into a two-party enterprise (the "SurgCenter-Upper Bay Enterprise") to engage in the actions described in Paragraphs 70-96, 140-56. As part of the RICO Scheme, Upper Bay Surgery Center, acting on behalf of the SurgCenter-Upper Bay Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Exhibit X.

213.    Upon information and belief, in each instance the SurgCenter-Upper Bay Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that Upper Bay Surgery Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Upper Bay Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts. Pursuant to the RICO Scheme described above, the SurgCenter-Upper Bay Enterprise fraudulently induced Cigna into making at least $118,560.06 in payments to Upper Bay Surgery Center.

### Count II.T. -- RICO, 18 U.S.C. § 1962(c)
### (Against SurgCenter and Windsor Mill Surgery Center)

214.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

215.    No later than 2013, SurgCenter and Windsor Mill Surgery Center entered into a two-party enterprise (the "SurgCenter-Windsor Mill Enterprise") to engage in the actions described in Paragraphs 70-96, 140-56. As part of the RICO Scheme, Windsor Mill Surgery Center, acting on behalf of the SurgCenter-Windsor Mill Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna

using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Exhibit Y.

216.    Upon information and belief, in each instance the SurgCenter-Windsor Mill Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that Windsor Mill Surgery Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Windsor Mill Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts. Pursuant to the RICO Scheme described above, the SurgCenter-Windsor Mill Enterprise fraudulently induced Cigna into making at least $6,875.16 in payments to Windsor Mill Surgery Center.

**Count III – Fraud**
**(Against All ASCs)**

217.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

218.    Under Maryland law each of the ASCs' conduct constitutes fraud.

219.    Each of the ASCs have submitted and continue to submit fraudulent claim forms to Cigna which list "charges" that are not the actual charges that the ASCs bill to their patients, pursuant to the dual pricing and fee-forgiving schemes described above. Specifically, each of the twenty Defendant ASCs followed the practices outlined in Paragraphs 70 through 96 above.

220.    As one example, a Defendant ASC submitted a bill with "charges" of $28,606.88 to Cigna. But through an internal investigation, Cigna found out that the ASC quoted to the patient a charge of only $5,787.50, and then charged the patient only his or her in-network cost-sharing percentages of that lower rate, even though the ASC is an out-of-network provider. Upon information and belief, every claim form submitted by every Defendant ASC to Cigna follows the same dual pricing pattern.

221.    At the time that the ASCs submitted claims to Cigna for reimbursement, each ASC knew that the material statements and representations about its charges for services were false.

222.    Each ASC knew and intentionally failed to disclose material information regarding the manner, extent and nature by which the ASC waived Cigna members' required out-of-network co-payments, deductibles, co-insurance, and other patient cost-sharing responsibility for the services provided to plan members.

223.    Each ASC also knew that the claims submitted to Cigna reflected false and inflated charges that the ASC did not charge their patients.

224.    Each ASC submitted the claims to Cigna with the intent to defraud Cigna by inducing Cigna to rely on their false representations and omissions alleged herein to pay these fraudulent charges. The misrepresentations were material.

225.    Cigna reasonably relied on such material false statements and omissions and paid the false and misleading claims submitted by each ASC, resulting in compensable injury to Cigna. Specifically, as result of this conduct, the ASCs received payments in excess of $20 million from Cigna as a result of the ASCs' fraudulent conduct.

### Count IV – Aiding and Abetting Fraud
### (Against SurgCenter)

226.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

227.    Under Maryland law, SurgCenter's conduct constitutes aiding and abetting fraud.

228.    Each of the ASCs committed fraud against Cigna by knowingly submitting fraudulent claim forms to Cigna in order to receive excessive, unjustified payments from Cigna as part of the fraudulent dual pricing and fee forgiving schemes described above. Specifically, each of the twenty Defendant ASCs followed the practices outlined in Paragraphs 70 through 96 above.

229.     As described above, all aspects of the fraudulent dual pricing and fee forgiving schemes were designed and implemented at the direction of SurgCenter. The purpose of these dual pricing schemes was to fraudulently induce insurers like Cigna to make unwarranted payments to the ASCs.

230.     SurgCenter was at all times aware of its role in the illegal and fraudulent schemes, and SurgCenter knowingly and substantially assisted, encouraged, incited, aided, and abetted the fraudulent conduct by each of the ASCs; indeed, SurgCenter developed, implemented, and participated in each of the fraudulent schemes, and it retains a 35% interest in each ASC.

231.     SurgCenter knowingly and substantially assisted in the fraudulent conduct in many ways. For example, upon information and belief, SurgCenter provides each ASC with the "Insurance Verification" and "Calculation of Patient Responsibility" sheets used by the ASCs to calculate the patient's responsibility under the dual pricing scheme, and SurgCenter provides each ASC with the language used on claim forms submitted to Cigna by the ASCs. These documents are provided to the ASCs by SurgCenter for the purpose of defrauding insurers such as Cigna.

232.     In addition, each of the ASCs, at the direction of and in coordination with SurgCenter, refuses to provide insurers like Cigna with information regarding the ASCs' billing practices in order to conceal those fraudulent billing practices.

233.     As a direct and proximate result of SurgCenter aiding and abetting the each of the ASCs' fraud, Cigna has suffered injury. Specifically, as result of this the ASCs' conduct, aided and abetted by SurgCenter, the ASCs received unwarranted payments in excess of $20 million from Cigna.

## Count V – Claim for Negligent Misrepresentation
### (Against all ASCs)

234.     The preceding paragraphs are incorporated by reference as if set forth fully herein.

235.     Under Maryland law the ASCs' conduct constitutes negligent misrepresentation.

236.     Each of the twenty Defendant ASCs followed the practices outlined in Paragraphs 70 through 96 above.

237.     Each ASC submitted benefit claim forms to Cigna regarding services that they provided to Cigna plan members; each ASC did so in the course of its business and had a pecuniary interest in the outcome of how Cigna processed benefits for those services, as any benefits for those services were paid directly to each ASC.

238.     In submitting benefit claim forms to Cigna, each ASC falsely stated "charges" for their services that were higher than the actual amounts that the ASCs required Cigna's plan members to pay for those services; each ASC supplied this false information to guide Cigna in processing benefits for those services.

239.     In submitting benefit claim forms to Cigna, the ASCs did not identify the actual amounts that the ASCs required Cigna's plan members to pay for those services, only falsely-stated "charges" that were higher than these amounts; in so doing, each ASC failed to exercise reasonable care or competence in communicating information regarding its charges to Cigna.

240.     Based upon the forms submitted by each ASC, Cigna processed benefits for services provided by the ASCs to its members based upon the falsely-stated "charges" stated on the forms submitted by the ASCs; thus, each time Cigna processed a claim based upon a falsely-stated charge, it suffered a pecuniary loss because it justifiably relied on the ASCs' communications.

241.     Cigna reasonably relied on such material false statements and omissions and paid the false and misleading claims submitted by each ASCs, resulting in compensable injury to Cigna.

Specifically, as result of this conduct, the ASCs received payments in excess of $20 million from Cigna as a result of the ASCs' fraudulent conduct.

### Count VI– Claim for Unjust Enrichment
### (Against all ASCs)

242.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

243.    Under Maryland law each of the ASCs' conduct give rise to a claim for unjust enrichment.

244.    Cigna's plans are required to cover some portion of the actual charges for services that plan members receive from out-of-network providers like the ASCs. Cigna's plans are not required to cover amounts that members are not billed, are not obligated to pay, or for which they would not have been billed if they did not have insurance.  Cigna's plans are also not required to cover amounts that exceed the Maximum Reimbursable Charge, as that term is defined in the plans.

245.    Each of the twenty Defendant ASCs followed the practices outlined in Paragraphs 70 through 96 above.

246.    The ASCs submitted benefit claim forms to Cigna falsely stating "charges" for services that were higher than the actual amounts that the ASCs required Cigna's plan members to pay for those services. Based on these forms, Cigna processed benefits for services provided by the ASCs to Cigna plan members based upon these falsely-stated "charges." Cigna paid these benefits directly to the ASCs.

247.    When Cigna paid benefits to the ASCs that Cigna's plan were not obligated to cover, the ASCs obtained a benefit from Cigna by the ASCs' fraud in falsely stating "charges" for their services that were higher than the actual amounts that the ASCs required Cigna's plan members to pay for those services. Therefore, it would be inequitable for the ASCs to retain these benefits.

248.    As a result of this conduct, the ASCs received payments in excess of $20 million from Cigna as a result of the ASCs' fraudulent conduct.

### Count VII – Claim for Tortious Interference with Contract
### (Against all Defendants)

249.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

250.    Under Maryland law, SurgCenter's and each of the ASCs' conduct give rise to a claim for tortious interference with contract.

251.    Each of the twenty Defendant ASCs followed the practices outlined in Paragraphs 70 through 96 above.

252.    Each of the members for whom the ASCs submitted benefits claims and received payment from Cigna received health care benefits pursuant to a benefit plan insured or administered by Cigna.

253.    Each of the plans pursuant to which the ASCs submitted claims and received payment contained, among other things, provisions that required the member to pay their cost-sharing responsibility (e.g. co-payments, co-insurance, and deductibles) in order for the plan to cover a portion of the submitted charges for services. SurgCenter and the ASCs knew that its patients' plans made the patients responsible for payment of the patients' cost-sharing responsibility.

254.    Despite this knowledge, the ASCs, at the direction of and in coordination with SurgCenter, engaged in a fraudulent dual pricing scheme in order to bill Cigna and its ASO clients inflated charges in excess of those actually charged to the patients, to induce the patients to use the ASCs' out-of-network services, and to undermine and circumvent Cigna's provider network system.

255.     Further, the ASCs, at the direction of and in coordination with SurgCenter, knowingly misrepresented to patients that the patients could use their "in-network" benefits at the ASCs.

256.     By these actions, the ASCs, at the direction of and in coordination with SurgCenter, induced the members to breach the terms of their plans.

257.     In addition, after Cigna discovered the fraudulent scheme and began disputing the ASCs' bills, several of the ASCs have made false and malicious statements to Cigna members in an effort to harm Cigna's relationship with its members, mislead Cigna members about the terms of their healthcare plans, and conceal the nature of the ASCs' fraudulent billing schemes. Upon information and belief, each of the twenty Defendant ASCs have made communications orally or in writing to Cigna members that are the same or substantially the same as the letter attached hereto as Exhibit E.

258.     Thus, the ASCs, at the direction of and in coordination with SurgCenter, maliciously and wrongfully interfered with the economic relationships between Cigna and its members.

259.     SurgCenter and the ASCs' tortious interference has caused damages to Cigna by causing it to make overpayments to the ASCs and has caused harm to the relationship between Cigna and its members, Cigna and its plan sponsor customers, and Cigna and its in-network providers.

### Count VIII – Declaratory Relief
### (Against all ASCs)

260.     The preceding paragraphs are incorporated by reference as if set forth fully herein.

261.     Under the Declaratory Judgment Act, the court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

262.     The ASCs provide facilities and related medical services, including equipment and supplies, to patients receiving medical care who are covered under employee health and welfare benefit plans that are insured or administered by Cigna.

263.     The claims the ASCs submitted, and continue to submit, are claims for reimbursement for services provided to patients who are purportedly covered under employee health and welfare benefit plans that are insured or administered by Cigna.

264.     As described in the preceding paragraphs, the claims the ASCs submitted are for charges that are not covered under the relevant plans because the claims are based on false charges submitted to Cigna, the ASCs failed to bill and collect the true out-of-network cost share responsibility from the Cigna plan members, and the ASCs did not hold the plan members responsible for the amounts charged to Cigna.

265.     As a result, any claims submitted by the ASCs are not reimbursable, and any payments the ASCs received under such claims should be returned to Cigna.

266.     An actual controversy exists between the ASCs and Cigna regarding whether claims for reimbursement are covered and payable under employee health and welfare benefit plans that are insured or administered by Cigna.

267.     Cigna seeks a declaration that the claims for reimbursement submitted by the ASCs are not for covered services and are not payable under employee health and welfare benefit plans that are insured or administered by Cigna.  Cigna also seeks a declaration that the ASCs must return all sums received from Cigna.

268.    Cigna also seeks recovery of its reasonable and necessary attorneys' fees and costs.

## JURY DEMAND
### (As to Non-ERISA Claims Only)

269.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

270.    With respect to Cigna's non-ERISA claims, Cigna hereby demands a trial by jury.

## PRAYER FOR RELIEF

Based on the foregoing, Cigna prays that the Court enter a judgment awarding the following:

a.    a declaration that the products and services provided by the ASCs do not constitute covered services under the employee health and welfare benefit plans administered or insured by Cigna and that the ASCs are not entitled to receive any payments on the claims for reimbursement that it has submitted or may submit in the future;

b.    return of any all monies paid to the ASCs on claims for reimbursement submitted by the ASCs;

c.    monetary damages for all harm suffered as a result of the ASCs' conduct;

d.    exemplary and punitive damages;

e.    pre-judgment and post-judgment interest;

f.    the reasonable and necessary attorneys' fees incurred;

g.    costs of court; and

h.    such other and further relief to which they may show themselves entitled in law or equity.


DATED this 25th day of July, 2014.

Respectfully submitted,

By: */s/ Stuart A. Berman*
Stuart A. Berman
Bar No. 08489
LONDON & MEAD
1225 19th Street, N.W., Suite 320
Washington, D.C. 20036
sberman@londonandmead.com
Tel: 202-331-3334
Fax: 202-785-4280


Joshua B. Simon (*pro hac vice* pending)
Warren Haskel (*pro hac vice* pending)
Ryan D. McEnroe (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10016
jsimon@kirkland.com
whaskel@kirkland.com
ryan.mcenroe@kirkland.com
Tel:  212-446-4800
Fax  212-446-4900

*Counsel for Plaintiffs*