IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

:

CONNECTICUT GENERAL LIFE
INSURANCE COMPANY, et al.          :

    v.                              :   Civil Action No. DKC 14-2376

:

ADVANCED SURGERY CENTER OF
BETHESDA, LLC, et al.              :

## MEMORANDUM OPINION

This case involves a dispute over health insurance claim payments. Plaintiffs/Counter-Defendants are Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company (collectively, the "Cigna entities").[1] Among other things, the Cigna entities insure and administer employee health and welfare benefit plans. (ECF No. 1 ¶ 41). Defendants/Counter-Plaintiffs are twenty ambulatory surgical care facilities doing business in Maryland, namely: Advanced Surgery Center of Bethesda, LLC; Bethesda Chevy Chase Surgery Center, LLC; Deer Pointe Surgical Center, LLC; Hagerstown

---

[1] Plaintiffs' Corporate Disclosure Statements reveal that they are both subsidiaries of "Connecticut General Corporation, which is a wholly-owned subsidiary of Cigna Holdings, Inc., which is a wholly-owned subsidiary of Cigna Corporation." (ECF Nos. 18 and 19). Although Plaintiffs repeatedly refer to themselves as "Cigna" as if they were a singular entity, it is unclear what relationship these two subsidiaries share, and whether they can be treated as one and the same for the purposes of this action. Accordingly, they will be referred to as the Cigna entities.

Surgery Center, LLC; Leonardtown Surgery Center, LLC; Maple Lawn Surgery Center, LLC; Maryland Specialty Surgery Center, LLC; Monocacy Surgery Center, LLC; Piccard Surgery Center, LLC; Riva Road Surgical Center, LLC; SurgCenter at National Harbor, LLC d/b/a Harborside Surgery Center; SurgCenter of Glen Burnie, LLC; SurgCenter of Greenbelt, LLC; SurgCenter of Silver Spring, LLC; SurgCenter of Southern Maryland, LLC; SurgCenter of Western Maryland, LLC; SurgCenter of White Marsh, LLC; Timonium Surgery Center, LLC; Upper Bay Surgery Center, LLC; and Windsor Mill Surgery Center, LLC ("the ASCs").   The ASCs have provided outpatient surgical services to the Cigna entities' plan members.   Defendant Surgical Center Development, Inc. d/b/a SurgCenter Development ("SurgCenter") is a Nevada corporation that purportedly helped establish the ASCs and consults in their businesses (collectively, the ASCs and SurgCenter are "Defendants").   (*Id.* ¶ 33).   The Cigna entities filed this action against Defendants asserting claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and state law based on Defendants' purportedly unlawful billing scheme.   The ASCs filed a counterclaim against the Cigna entities asserting ERISA claims and multiple state law claims based on the Cigna entities' purportedly unlawful refusal to pay claims for medical services

2

the ASCs performed for the Cigna entities' health insurance plan members.  The parties have filed cross-motions to dismiss, which are fully briefed.  (ECF Nos. 41 and 43).  The court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, Defendants' motion to dismiss will be granted in part and denied in part, and the Cigna entities' motion to dismiss will be granted in part and denied in part.

## I.   Background[2]

### A.   The Cigna Entities' Health Insurance Plans

The Cigna entities act as plan administrators for both fully-insured plans, which they fund themselves, and Administrative Services Only ("ASO") plans, which are funded by the employers who sponsor them.  (*Id.* ¶¶ 42, 44).  For both types of plans, as claims administrators, the plan documents authorize the Cigna entities to "recover any overpayments made by the plans on the plans' behalf."  (*Id.* ¶¶ 45-46).  The majority of the plans under which the ASCs have sought benefits on behalf of their patients are governed by ERISA.  (*Id.* ¶ 47). The plans at issue offer plan members the choice of seeking medical services from health care providers who contract with the Cigna entities to participate in their provider network

---

[2] The following facts are either set forth in the complaint or evidenced by documents referenced or relied upon in the complaint.

("in-network" or "participating" providers) or from health care
providers who do not contract with the Cigna entities ("out-of-
network providers"). (*Id.* ¶ 48). All of the ASCs are out-of-
network providers. (*Id.* ¶ 2). The Cigna entities' plans
reimburse members for certain types of costs and services they
receive, which are defined as "covered expenses." When a plan
member receives medical services, the Cigna entities determine
what portion of the cost for the covered expense is covered by
the plan, which is known as the "allowed amount." (*Id.* ¶ 49).
Plan members have different types of cost-sharing
responsibilities when using their plan benefits, including
deductibles, co-payments, and co-insurance. (*Id.* ¶¶ 50-51). If
a plan member receives a medical service from one of the Cigna
entities' in-network providers, the plan pays the provider the
amount that the provider agreed to accept as the contracted
network rate, and the member pays any applicable in-network
deductible, co-pay, and co-insurance. (*Id.* ¶ 52). If a plan
member receives a medical service from an out-of-network
provider, the provider can charge whatever it likes for its
services (out-of-network rates are generally higher than
contracted rates) and the provider may bill the member for any
portion of the provider's charges that the plan does not
reimburse (amounts not covered by the allowed amount). (*Id.* ¶
55).

In order to keep costs down for plans that offer out-of-network benefits, the Cigna entities' health plans include various financial incentives to encourage members to choose in-network providers and to make members responsible for the increased costs associated with obtaining out-of-network services. (*Id.* ¶ 56). One method the Cigna entities' plans use to allocate out-of-network costs between plan sponsors and plan members is through co-insurance, which is the percentage of the allowed amount that the member is required to pay toward the cost of that service. The co-insurance that plan members must pay for out-of-network services is usually much higher than the co-insurance they pay for in-network services. (*Id.* ¶ 57). The Cigna entities allege that their plans include a provision which ensures that plan members pay and out-of-network providers do not waive members' required co-insurance payments. This provision states that the Cigna entities' plans do not cover: "charges which you [the member] are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan." (*Id.* ¶ 61). In addition, the Cigna entities allege that their plans limit reimbursement for out-of-network services to the "maximum reimbursable charge," which is further defined as no more than the "provider's normal charge for a similar service or supply," and exclude from coverage any amounts that exceed the maximum

reimbursable charge. (*Id.* ¶ 63). The Cigna entities aver that they do not automatically reimburse plan members for every charge submitted to them by providers; rather, the plans cover only a portion of charges submitted for covered expenses (the allowed amount), and the covered expenses also are subject to the member's cost sharing responsibilities (any applicable deductible, co-pay, and co-insurance), meaning a member must pay his or her portion in order for the charges to be covered under the plan. (*Id.* ¶ 65).

### B.   The ASCs' Billing Practices

The Cigna entities allege that "SurgCenter has developed a business model designed to game the healthcare system by submitting grossly inflated, phantom 'charges' to [them] that do not reflect the actual amount the ASCs bill patients. SurgCenter implements this fraudulent scheme through each of the ASCS with which it partners." (*Id.* ¶ 70). SurgCenter partners with local surgeons to form physician-owned ASCs organized as limited liability companies, and becomes a vested partner with thirty-five percent ownership in each ASC, including the twenty Defendant ASCs. (*Id.* ¶¶ 71-74). SurgCenter helps design and construct the ASCs, and once they are operational, SurgCenter continues providing "no-fee management and consulting services in managing and running [the ASCs]." (*Id.* ¶¶ 72-73).

6

The Cigna entities allege that the ASCs have engaged and continue to engage in a fee-waiver and dual pricing scheme, with significant support and assistance from SurgCenter.  As part of this scheme, the ASCs engaged in fee-waivers by "lur[ing] [the Cigna entities'] plan members in as patients by offering to bill and collect for surgical procedures at the plan members' 'in-network' or lower benefit levels, even though the ASCs knew that, because they are out-of-network facilities, the plan members' out-of-network benefits level should apply."  (*Id.* ¶ 3).  The ASCs promised the Cigna entities' plan members that their in-network benefits would apply (including deductible, co-pay, and co-insurance) to services rendered by the ASCs and that the plan members would incur no additional out-of-pocket costs above and beyond the costs the ASCs quoted to the plan members (*Id.* ¶ 67), and the ASCs actually calculated the Cigna entities' plan members' cost-sharing responsibilities (deductible, co-pay, and co-insurance) by applying members' in-network rates.  (*Id.* ¶ 83).  The Cigna entities also allege that the ASCs' scheme involved "dual pricing":  the ASCs billed the Cigna entities' plan members a certain charge that was based on Medicare rates for the service rendered (in order to approximate an in-network contracted rate), while billing the Cigna entities a significantly higher charge for the same service.  While the ASCs' claim forms acknowledged that "[t]he insured's portion of

7

this bill has been reduced in amount so the patient's responsibility for the deductible and copay amount is billed at in network rates," the claim forms did not disclose the full nature of the fee waiver or that patients had been billed based on entirely different charges that mirrored Medicare-based rates. (*Id.* ¶¶ 4, 91-92). The Cigna entities allege that by stating "[t]he insured's portion of *this bill* has been reduced," the ASCs and SurgCenter affirmatively sought to mislead the Cigna entities into believing that they charged the patient and the Cigna entities the same charge. (*Id.* ¶ 93). The Cigna entities assert that they relied on the ASCs' misrepresentations and omissions in their claim forms when processing and paying the ASCs' claims.

The Cigna entities further assert that "all aspects of the fraudulent dual pricing schemes used by each ASC were designed and implemented at the direction of SurgCenter." (*Id.* ¶ 79). The Cigna entities allege that "SurgCenter creates the Insurance Verification sheet and Calculation of Patient Responsibility templates, as well as the claim forms submitted to [the Cigna entities] by the ASCs. These documents are created by SurgCenter and provided to the ASCs as part of the scheme to defraud insurers such as [the Cigna entities]." (*Id.* ¶ 84).

The Cigna entities provide the following example of a charge that was submitted on behalf of one of their plan members

by an ASC Defendant in order to show how the purported scheme operated:

> [T]he ASC submitted "charges" of $28,606.88 to [a Cigna entity].  The member had an out-of-network co-insurance requirement of 20 percent.  But through an internal investigation, [the Cigna entity] found out that the ASC quoted to the patient a charge of only $5,787.50, or approximately five times lower than the charge submitted to [it].  After already starting at the much lower baseline charge based on Medicare rates, the ASC then charged the patient his or her in-network cost-sharing levels[.]  As a result, the ASC charged the patient only $431.88, which was a small fraction of the patient's cost-sharing responsibility under his or her plan.

(*Id.* ¶ 5).[3]  Based on Defendants' scheme, the Cigna entities allege that between 2009 and the present, they were fraudulently induced into paying more than $20 million in claim payments to the various ASC Defendants.  (*Id.* ¶¶ 12, 97-116).

   C.   **Procedural History**

     The Cigna entities commenced the instant action on July 25, 2014 by filing a complaint against Defendants.  (ECF No. 1).  The complaint asserts multiple claims against Defendants, including: a claim for overpayments under ERISA § 502(a)(3) (count I); violations of RICO (counts II.A-II.T); state law claims for fraud (count III); aiding and abetting fraud (count IV); negligent misrepresentation (count V); unjust enrichment

---

[3] Additional allegations regarding Defendants' purportedly fraudulent scheme will be discussed in the analysis section.

(count VI); tortious interference with contract (count VII); and declaratory judgment (count VIII).

On August 29, 2014, the parties moved to consolidate several related actions that had been removed from state court pursuant to Federal Rule of Civil Procedure 42(a) on the basis that the actions involved common questions of law and fact. (ECF No. 34).   The motion to consolidate was granted on September 12, 2014.  (ECF No. 40).

Defendants moved to dismiss the complaint on October 21, 2014 pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim.  (ECF No. 41).   On the same day Defendants filed their motion to dismiss, the ASCs filed a counterclaim against the Cigna entities.  (ECF No. 42).   On December 5, 2014, the Cigna entities moved to dismiss the counterclaim pursuant to Rule 12(b)(6).   (ECF No. 43).   Both motions to dismiss are fully briefed.

## II.  Standard of Review

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the sufficiency of the complaint. *Presley v. City of Charlottesville,* 464 F.3d 480, 483 (4th Cir. 2006).   A plaintiff's complaint need only satisfy the standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed.R.Civ.P. 8(a)(2).  "Rule 8(a)(2) still requires a 'showing,' rather than

10

a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 n.3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal citations omitted).

At this stage, all well-pleaded allegations in a complaint must be considered as true, *Albright v. Oliver,* 510 U.S. 266, 268 (1994), and all factual allegations must be construed in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 783 (4th Cir. 1999) (*citing Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir. 1993)). In evaluating the complaint, unsupported legal allegations need not be accepted. *Revene v. Charles Cnty. Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989). Legal conclusions couched as factual allegations are insufficient, *Iqbal,* 556 U.S. at 678, as are conclusory factual allegations devoid of any reference to actual events. *United Black Firefighters v. Hirst,* 604 F.2d 844, 847 (4th Cir. 1979).

Moreover, allegations of fraud, which the Cigna entities assert in the RICO and state law claims, are subject to a heightened pleading standard under Rule 9(b). *Harrison,* 176 F.3d at 783. Rule 9(b) states that "in alleging a fraud or mistake, a party must state with particularity the circumstances

11

constituting the fraud or mistake.   Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."   Such allegations typically "include the 'time, place and contents of the false representation, as well as the identity of the person making the misrepresentation and what [was] obtained thereby.'"   *Superior Bank, F.S.B. v. Tandem Nat'l Mortg., Inc.,* 197 F.Supp.2d 298, 313-14 (D.Md. 2000) (*quoting Windsor Assocs., Inc. v. Greenfeld,* 564 F.Supp. 273, 280 (D.Md. 1983)).   In cases involving concealment or omissions of material facts, however, meeting Rule 9(b)'s particularity requirement will likely take a different form.   *See Shaw v. Brown & Williamson Tobacco Corp.,* 973 F.Supp. 539, 552 (D.Md. 1997) (recognizing that an omission likely "cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation" (internal quotations omitted)). The purposes of Rule 9(b) are to provide the defendant with sufficient notice of the basis for the plaintiff's claim, to protect the defendant against frivolous suits, to eliminate fraud actions where all of the facts are learned only after discovery, and to safeguard the defendant's reputation.   *See Harrison,* 176 F.3d at 784.   In keeping with these objectives, "[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant[s were] made aware of the particular

12

circumstances for which [they] will have to prepare a defense at trial and (2) that [the] plaintiff has substantial prediscovery evidence of those facts." *Id.*

### III. Defendants' Motion to Dismiss the Cigna Entities' Complaint

#### A. Claim for Overpayments Pursuant to ERISA § 502(a)(3) (Count I)

The Cigna entities assert a claim under ERISA § 502(a)(3) against all the ASCs seeking:  (1) restitution of past "overpayments" that were purportedly made to the ASCs in contravention of the plan terms, and (2) an injunction barring the ASCs from submitting similar claims in the future.  The Cigna entities allege that they are fiduciaries of the plans that they administer and seek to recover overpayments made by those plans to the ASCs.  (ECF No. 1 ¶ 128).  The Cigna entities further allege that the plans at issue do not cover "any portion of the charges that [] the ASCs do not require plan members to pay, nor do they require the plan to cover anything in excess of the ASCs' normal charges to its patients." (*Id.* ¶ 131).  The Cigna entities aver that the ASCs did not require their plan members to pay the full amount of their cost sharing responsibilities under the terms of their plans.  Accordingly, the Cigna entities argue that by "paying the ASCs amounts that the ASCs did not charge plan members, these plans made overpayments to the ASCs[,]" overpayments which belong to the

plans.   (*Id.*   ¶¶  132,  134).   The  Cigna  entities  seek reimbursement   of   the   alleged   overpayments,   or   in   the alternative,  a  declaration  that  they  may  offset  from  future claim  payments  the  overpayment  amounts.   The  Cigna  entities  also seek  a  permanent  injunction  directing  all  of  the  ASCs  to  submit to  the  Cigna  entities  only  the  charges  that  they  actually  charge the  plan  members  for  the  ASCs'  services  and  not  to  submit charges  that  they  do  not  require  the  member  to  pay  (including any  waived  portions  of  members'  out-of-network  co-payment,  co-insurance,  or  deductible  amounts).

ERISA  authorizes  plan  fiduciaries[4]  to  bring  civil  actions under  §  502(a)(3):  "(A)  to  enjoin  any  act  or  practice  which violates  any  provision  of  this  subchapter  or  the  terms  of  the plan,  or  (B)  to  obtain  other  appropriate  *equitable  relief*  (i)  to redress  such  violations  or  (ii)  to  enforce  any  provisions  of

---

[4]  As  recently  noted  by  the  United  States  Court  of  Appeals for  the  Fourth  Circuit  in  *Pender  v.  Bank  of  Am.  Corp.,*  No.  14-1011,  2015  WL  3541927,  at  *5  (4th  Cir.  June  8,  2015):

> Under  ERISA,  a  person  is  a  fiduciary  vis-à-vis  a  plan  "to  the  extent"  that  he  (1) "exercises  any  discretionary  authority  or discretionary  control  respecting  management of  such  plan  or  .  .  .  its  assets,"  (2) "renders  investment  advice  for  a  fee  or other  compensation,"  or  (3)  "has  any discretionary  authority  or  discretionary responsibility  in  the  administration  of  such plan."   ERISA  §  3(21)(A),  29  U.S.C.  § 1002(21)(A).

this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3) (emphasis added).

### 1.   Reimbursement Based on Equitable Restitution or an Equitable Lien under ERISA § 502(a)(3)(B)

Defendants have moved to dismiss the claim for reimbursement of overpayments contending that it seeks legal damages rather than equitable relief, and is therefore prohibited because compensatory damages are not recoverable under ERISA.

ERISA § 502(a)(3)(B) permits plan fiduciaries to seek equitable relief only. The Supreme Court of the United States has clarified that this section authorizes "those categories of relief that were *typically* available in equity[.]" *Sereboff v. Mid Atl. Med. Servs.*, 547 U.S. 356, 361 (2006) (emphasis in original) (internal citation and quotation marks omitted). In *Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 205 (2002), the Court noted that a claim is not equitable simply because a plaintiff labels it as such; rather, "whether it is legal or equitable depends on the basis for the plaintiff's claim and the nature of the underlying remedies sought." *Id.* at 212-13 (internal citation and quotation marks omitted). Accordingly, plan fiduciaries seeking restitution for alleged overpayments of plan benefits, such as the Cigna entities, must

establish that the relief they seek under § 502(a)(3)(B) is equitable rather than legal restitution.

In *Knudson*, the Court clarified some of the differences between equitable and legal restitution:

> In cases in which the plaintiff could *not* assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him, the plaintiff had a right to restitution *at law* through an action derived from the common-law writ of assumpsit. In such cases, the plaintiff's claim was considered legal because he sought to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money. Such claims were viewed essentially as actions at law for breach of contract (whether the contract was actual or implied).
>
> In contrast, a plaintiff could seek restitution *in equity*, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession. A court of equity could then order a defendant to transfer title (in the case of the constructive trust) or to give a security interest (in the case of the equitable lien) to a plaintiff who was, in the eyes of equity, the true owner. But where the property sought to be recovered or its proceeds have been dissipated so that no product remains, the plaintiff's claim is only that of a general creditor, and the plaintiff cannot enforce a constructive trust of or an equitable lien upon other property of the defendant. Thus, for restitution to lie in equity, the action generally must seek not

> to impose personal liability on the
> defendant, but to restore to the plaintiff
> particular funds or property in the
> defendant's possession.

534 U.S. at 213-14 (emphases in original) (footnote omitted) (internal citations and quotation marks omitted). In *Knudson*, the plan paid the medical expenses of a beneficiary who had been injured in a car accident. When the beneficiary settled a lawsuit arising from the accident, the beneficiary placed settlement funds in a special needs trust. The plan fiduciary sought to recover reimbursement of the medical expenses under ERISA § 502(a)(3)(B) based on a plan provision which reserved "a first lien upon any recovery, whether by settlement, judgment or otherwise, that the beneficiary receives from a third party, not to exceed the amount of benefits paid by the Plan or the amount received by the beneficiary for such medical treatment." *Id.* at 207 (internal citations and quotation marks omitted). The Court found that the basis of the fiduciary's claim was legal rather than equitable because the funds it sought — the proceeds from the settlement of the beneficiary's tort claim — were not in the beneficiary's possession, but rather in a special needs trust account. Accordingly, the Court concluded that the fiduciary's suit was not authorized by § 502(a)(3) because it actually sought compensatory damages — "*some* funds for benefits that they conferred" — rather than the equitable return of specific funds

belonging to the fund that were within the beneficiary's possession. Accordingly, *Knudson* established that when making a claim for equitable restitution under ERISA § 502(a)(3), a fiduciary must establish that it is seeking return of specifically identifiable funds (or proceeds thereof) that are within the defendant's possession and control that rightfully belong to the plan. *Id*. at 212-18. The "tracing method" of establishing that the restitution it seeks is equitable requires a fiduciary to trace its money to a particular fund or asset in the defendant's possession or control.

In *Sereboff,* the Supreme Court recognized a second means by which a plan fiduciary may seek equitable reimbursement of plan funds pursuant to § 502(a)(3). In that case, the plan paid medical expenses of plan beneficiaries who were injured in an automobile accident. The beneficiaries subsequently received a settlement from the third party tortfeasor and were required to set aside a portion of the proceeds from the settlement in an investment account due to a temporary restraining order and preliminary injunction filed by the plan fiduciary. The Court addressed whether the ERISA fiduciary's claim under § 502(a)(3)(B) seeking reimbursement of these plan funds was "equitable" in nature. The ERISA plan at issue in *Sereboff* had an "Acts of Third Parties" provision, which required beneficiaries to reimburse the plan administrator if the

beneficiary later recovered monies for those injuries from a lawsuit or settlement with a third party. 547 U.S. at 359. The beneficiaries in *Sereboff* argued that the monies sought by the fiduciary did not meet the "strict tracing rules" required for equitable restitution because the fiduciary could not trace *its* money to a particular fund or asset, or product thereof, in defendant's possession. The Court rejected this argument, finding that strict tracing requirements were only necessary for "equitable liens sought as a matter of restitution," and clarified that when an equitable lien over the funds at issue has been created by agreement (or assignment), no tracing of funds is required in order for it to be an equitable remedy. *Id.* at 365-68.

The Court cited two cases "from the days of the divided bench" to elaborate on how equitable liens are created and why they permit recovery even in the absence of the tracing requirement. First, the Court discussed *Barnes v. Alexander,* 232 U.S. 117 (1914), a case in which an attorney, Barnes, promised two other attorneys, Street and Alexander, one-third of the contingent fee he expected to receive. The Court likened the attorneys' claim in *Barnes* to a portion of the contingency fee to that of the plan fiduciary's claim to third party payments:

> In upholding their equitable claim to this
> portion of the fee, Justice Holmes recited
> [in *Barnes*] "the familiar rule of equity
> that a contract to convey a specific object
> even before it is acquired will make the
> contractor a trustee as soon as he gets a
> title to the thing." On the basis of this
> rule, he concluded that Barnes' undertaking
> "created a lien" upon the portion of the
> monetary recovery due Barnes from the
> client, which Street and Alexander could
> "follow . . . into the hands of . . .
> Barnes," "as soon as the fund was
> identified[.]"
>
> Much like Barnes' promise to Street and
> Alexander, the "Acts of Third Parties"
> provision in the Sereboffs' plan
> specifically identified a particular fund,
> distinct from the Sereboffs' general assets
> — "all recoveries from a third party
> (whether by lawsuit, settlement, or
> otherwise)" — and a particular share of that
> fund to which Mid Atlantic was entitled —
> "that portion of the total recovery which is
> due [the plan fiduciary] for benefits paid."
> Like Street and Alexander in *Barnes*,
> therefore, Mid Atlantic could rely on a
> "familiar rule of equity" to collect for the
> medical bills it had paid on the Sereboffs'
> behalf. This rule allowed them to "follow"
> a portion of the recovery "into the
> Sereboffs' hands" "as soon as the settlement
> fund was identified," and impose on that
> portion a constructive trust or equitable
> lien.

*Sereboff*, 547 U.S. at 363-64 (internal citations omitted).

Second, the Court cited to *Walker v. Brown*, 165 U.S. 654 (1897),

for the general principle that "to dedicate property to a

particular purpose, to provide that a specific creditor and that

creditor alone shall be authorized to seek payment of his debt

from the property or its value, is unmistakably to create an equitable lien." *Sereboff*, 547 U.S. at 367-68 (internal citation omitted). The Court held that the "Acts of Third Parties" provision in the Sereboffs' plan identified specific funds and a particular share of those funds that the plan fiduciary was entitled to recover, and accordingly, created an equitable lien or constructive trust over those funds, which permitted the plan fiduciary to seek equitable reimbursement pursuant to ERISA § 502(a)(3)(B).

In the wake of *Knudson* and *Sereboff*, plan fiduciaries have at least two methods of establishing that their claims seeking reimbursement of plan funds under ERISA § 502(a)(3)(B) are equitable in nature: (1) the "tracing method" set forth in *Knudson*, and (2) the equitable lien or constructive trust method set forth in *Sereboff*.

### a.   Reimbursement Based on the "Tracing Method"

Defendants correctly argue that the relief the Cigna entities seek is not equitable because the Cigna entities have not identified specific assets separate and apart from the ASCs' general assets. The Cigna entities' complaint fails to establish that the § 502(a)(3)(B) claim is "equitable" in nature because its allegations do not plausibly allege that the overpayments are currently in the ASCs' possession and are specifically identifiable. Indeed, the only allegation

supporting that the Cigna entities can specifically identify and trace plan funds is that the "overpayments [at issue] are within the possession and control of the Defendants." (ECF No. 1 ¶ 135). The Cigna entities have not alleged that the overpayments were kept in separate accounts or otherwise how they are separate and distinct from the ASCs' general assets. *See Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Health Special Risk, Inc.,* 756 F.3d 356, 366 (5th Cir. 2014) (affirming dismissal of the plan fiduciary's ERISA § 502(a)(3) claim because the fiduciary, who sought reimbursement from its beneficiaries' secondary insurance policies, had not identified specific funds, but merely "general assets of [d]efendants, which were not received from, and have not been promised to, [the plan fiduciary]."). The Cigna entities make only a bald assertion, devoid of any factual support, that these overpayments, which were purportedly made between 2009 and present day, are still within the ASCs' possession and are identifiable from their general assets.

> **b. Reimbursement Based on an Equitable Lien**

The Cigna entities argue that even if the overpayments are not strictly traceable, courts have permitted equitable recovery of overpaid plan funds where the parties have an agreement, such as the Cigna entities' plan documents, that provide an equitable lien or constructive trust over payments made on behalf of the

plan.   The Cigna entities point to a provision within their plan documents titled "Recovery of Overpayment," which states that: "When an overpayment has been made by Cigna, Cigna will have the right at any time to:  recover that overpayment from the person to whom or on whose behalf it was made; or offset the amount of that overpayment from a future claim payment" ("Overpayment Provision") (ECF No. 44-1, at 39).   The Cigna entities argue that this Overpayment Provision creates an equitable lien over the funds they seek to recover.   Defendants argue that the relief the Cigna entities seek is not equitable because the provision they cite does not create an equitable lien on any portion of the benefits that have been paid to the ASCs.

"ERISA-plan provisions do not create constructive trusts and equitable liens by the mere fact of their existence; the liens and trusts are created by the agreement between the parties to deliver assets." *Health Special Risk, Inc.*, 756 F.3d at 365.   Accordingly, the plan document itself must be examined to determine whether its language creates an equitable lien.   As discussed by the Supreme Court in *Walker*, 165 U.S. at 664, an equitable lien may be created against a person's real or personal property either by express language or by "implication from the terms of the agreement, construed with reference to the situation of the parties at the time of the contract[.]"   The

Court also summarized the manner in which equitable liens are created and their enforcement:

> Every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands, not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees, and purchasers or incumbrancers with notice.

*Id.* at 664-65.

Here, the Cigna entities have not plausibly alleged that their plan documents created an equitable lien over the overpayments, which permits them to recover the overpayments under ERISA § 502(a)(3)(B) from the ASC.[5]  The language in the Overpayment Provision may grant the Cigna entities a contractual right to recoupment of *some* funds from a plan member to whom or

---

[5]   The complaint incorporates by reference the Cigna entities' plan documents, the terms of which purportedly govern the plans at issue in this case. (ECF No. 44-1). Accordingly, the plan document, which is attached as an exhibit to the Cigna entities' opposition motion, may be considered in adjudicating Defendants' motion to dismiss. *See Clark v. BASF Corp.*, 142 Fed.App'x 659, 660-61 (4th Cir. 2005) (finding that the district court properly considered an ERISA plan document on a motion to dismiss because even though the plan document was not attached to the complaint, there was "no dispute as to its authenticity, the document was referenced in the complaint, and the document was central to [plaintiff's] claims").

on whose behalf an overpayment was made.   How that language
creates an equitable lien or constructive trust on every
overpayment of benefits made by a Cigna entity to a provider is
far from obvious.   *See Gallagher v. Reliance Std. Life Ins. Co.,*
305 F.3d 264, 269 (4th Cir. 2002) (internal citation and
quotation marks omitted) ("Any ambiguity in an ERISA plan is
construed against the drafter of the plan, and it is construed
in accordance with the reasonable expectations of the
insured.").   The Overpayment Provision, as written, may permit a
Cigna entity to recoup an overpayment that it made *to* a provider
directly *from* a plan member or to refuse to pay future claim
amounts of the member in order to offset prior overpayments.
Both of these scenarios indicate that the Cigna entities have
the right to recoup *some* funds from a plan member but not the
*particular* payment made.   The Cigna entities appear to argue
that the provision allows them to recover overpayments made
directly to a provider from that provider.   The plan language
does not support that conclusion.   A comparison of the language
used on the page directly preceding the Overpayment Provision
under the section "Expenses For Which A Third Party May Be
Responsible" ("Third Party Payor Section") with the language
used in the Overpayment Provision, demonstrates that the
provision at issue does not create an equitable lien.   The Third

25

Party    Payor    Section    includes    a    subsection    entitled

"Subrogation/Right of Reimbursement" which states that:

> If a Participant incurs a Covered Expense
> for which . . . another party may be
> responsible or for which the Participant may
> receive payment [from a third party
> tortfeasor] . . . [t]he plan is [] granted a
> right of reimbursement from the proceeds of
> any recovery whether by settlement,
> judgment, or otherwise.

(ECF NO. 44-1, at 38).   More importantly, the Third Party Payor

Section includes a subsection entitled "Lien of the Plan," which

states that:

> By accepting benefits under this plan, a
> Participant: grants a lien and assigns to
> the plan an amount equal to the benefits
> paid under the plan against any recovery
> made by or on behalf of the Participant . .
> .[;] agrees that this lien shall constitute
> a charge against the proceeds of any
> recovery and the plan shall be entitled to
> assert a security interest thereon; [and]
> agrees to hold the proceeds of any recovery
> in trust for the benefit of the plan to the
> extent of any payment made by the plan.

(*Id.*).   This language clearly creates a lien or constructive

trust on particular funds that come into a plan members'

possession, and could reasonably be understood by a plan member

as asserting such a lien or constructive trust.   The language

used in the Overpayment Provision cannot be understood by a plan

member — or a provider that is not a party to the plan — as

asserting an equitable lien or constructive trust on plan

overpayments to providers.

The Cigna entities' allegations do not state an equitable claim for recovery of overpayments pursuant to ERISA § 502(a)(3)(B).  Accordingly, this portion of the Cigna entities' ERISA claim will be dismissed.

**2.   Injunctive Relief**

The Cigna entities also seek a permanent injunction pursuant to ERISA § 502(a)(3)(A), "directing all of the ASCs to submit to [them] only charges that the ASC actually charges the plan member as payment in full for the ASCs' services and not to submit charges which include amounts that the ASC does not actually require the member to pay (including, without limitation, the waiver of any portion of the members' required out-of-network co-insurance, co-payment, and deductible amounts)." (ECF No. 1 ¶ 138).

Defendants argue that an ERISA claim for an injunction is barred because, if granted, the injunction would breach the Cigna entities' fiduciary duty to plan members.  Specifically, Defendants argue that an injunction would "prevent the ASCs from discounting the co-payments charged to [the Cigna entities'] insureds — thereby directly harming those insureds[,]" and by restricting insureds' "choice of medical provider by enjoining the ASCs from matching their patients' in-network out-of-pocket costs." (ECF No. 51, at 14-15).

The Cigna entities' request for injunctive relief is appropriate under ERISA § 502(a)(3)(A).  They have identified a billing practice by the ASCs which may violate the terms of the plans at issue by not holding plan members accountable for their required contribution amounts (including deductibles, co-pays, and co-insurance) and by billing members and the Cigna entities based on different underlying charges.  The Cigna entities, purportedly acting as plan fiduciaries, seek to enjoin these practices in order to enforce the terms of the plans. Defendants' argument that this claim is barred because the relief the Cigna entities seek would breach their fiduciary duties fails because it is an affirmative defense that is not appropriate to consider at this stage in the proceedings.[6] Accordingly, Defendants' motion to dismiss has failed to

---

[6] An affirmative defense is not ordinarily considered on a motion to dismiss because plaintiffs are not required to negate them in their complaints.  The purpose of a motion to dismiss under Fed.R.Civ.P. 12(b)(6) is to "test the legal adequacy of the complaint, and not to address the merits of any affirmative defenses." *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993).  "A court may consider defenses on a 12(b)(6) motion only 'when the face of the complaint clearly reveals the existence of a meritorious affirmative defense.'" *E. Shore Markets, Inc. v. J.D. Assoc. Ltd. P'ship,* 213 F.3d 175, 185 (4th Cir. 2000); *see also* 5A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1357, at 348 (2d ed. 1990).  It is not clear from the face of the complaint that the Cigna entities' requested relief would violate their fiduciary duties.  Indeed, they seek through the injunction purportedly to enforce the terms of the plans, which is consistent with their fiduciary duties.

demonstrate that the Cigna entities' ERISA § 502(a)(3) claim must be dismissed insofar as it seeks injunctive relief.

### B.  Civil RICO Claim Pursuant to § 1962(c) (Counts II.A to II.T)

The Cigna entities assert a claim pursuant to RICO's civil provision, 18 U.S.C. § 1964, which provides a cause of action to "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]."  The Cigna entities allege that Defendants violated RICO § 1962(c).  In order for a civil RICO claim to survive a motion to dismiss, a plaintiff must allege "(1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985).  Plaintiffs must additionally plead proximate cause, that is that they were injured in their businesses or property "by reason of" the RICO violation. *Hemi Group, LLC v. City of New York, N.Y.,* 559 U.S. 1, 6 (2010).

The Cigna entities allege that SurgCenter entered into two-party associations-in-fact with each ASC, which constitute twenty separate enterprises under RICO.  (ECF No. 1 ¶ 140). According to the Cigna entities:

> SurgCenter came to agreements with each of the ASCs to create the enterprises, the purpose of which is to operate for-profit medical centers and thereby enrich the enterprise's members by luring [the Cigna entities'] plan members to use these out-of-network centers through misrepresentation about the centers' costs to plan members,

> [the Cigna entities], and their plans.
> SurgCenter's role in each of the twenty
> enterprises was to invest in the ASC and
> provide operational support to the ASC.
> Among other things, Surgcenter developed the
> dual pricing scheme [] and directed the ASCs
> to follow the dual pricing scheme, which
> each of the twenty ASCs agreed to do.
> SurgCenter also provided each ASC with the
> sample language to include on claim forms
> submitted to managed care companies like
> [the Cigna entities.]

(*Id.* ¶ 140).  The Cigna entities allege that the ASC's role in the enterprise was to:  (1) lure patients to the facility by misleading the patients into believing that they could use their "in-network" benefits at the ASC; (2) treat patients and charge the patients little or nothing for the ASC's services; and (3) submit exorbitant, fraudulent charges to managed care companies like the Cigna entities in order to induce them to pay the ASC based on the fraudulent sums submitted.  (*Id.*).  The Cigna entities allege that each ASC submitted numerous fraudulent claim forms to the Cigna entities and that each claim form submitted constitutes a separate act of mail and wire fraud.  (*Id.* ¶¶ 148-50).  SurgCenter is alleged to have helped direct and coordinate the purported acts of mail and wire fraud.  (*Id.* ¶ 151).  The Cigna entities contend that by submitting thousands of forms over the past several years, the purported enterprises have engaged in a pattern of racketeering activity.  (*Id.* ¶ 153).

Defendants move to dismiss the Cigna entities' RICO claim on several grounds, the first of which is that the Cigna entities have failed to allege an actionable, ongoing, enterprise that is distinct from Defendants themselves and distinct from the alleged racketeering activity. (ECF No. 41-1, at 15-20). Defendants argue that the Cigna entities have not met the distinctiveness requirement of § 1962(c) because the ASC is the only participant in the enterprise that has purportedly engaged in fraudulent activities. According to Defendants, SurgCenter has only been named as part of the sham "enterprises" because the Cigna entities recognized that an ASC, standing alone, could not constitute an "enterprise" under RICO. Defendants also argue that the members of the alleged enterprises, SurgCenter and an individual ASC, are not distinct, independent entities because SurgCenter is a thirty-five percent owner of each ASC, provides management services to each ASC, and directed the allegedly fraudulent billing scheme. (ECF No. 41-1, at 16-18).

Under 18 U.S.C. § 1962(c), it is unlawful:

> for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

31

"[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 161 (2001). There must be a "person," alleged to have violated Section 1962(c) and to be liable to the claimant for damages, who is separate and distinct from the "enterprise," or tool, through which the RICO violation occurred. *See Busby v. Crown Supply, Inc.,* 896 F.2d 833, 840-41 (4th Cir. 1990); *New Beckley Mining Corp. v. Int'l Union, United Mine Workers,* 18 F.3d 1161, 1163 (4th Cir. 1994). A "person" can be an individual or corporate entity.  18 U.S.C. § 1961(3). "Enterprise," as set forth in 18 U.S.C. § 1961(4), "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." An "enterprise" requires proof of three elements: (1) an ongoing organization; (2) associates functioning as a continuing unit; and (3) the enterprise is an entity "separate and apart from the pattern of activity in which it engages." *Proctor v. Metro. Money Store Corp.,* 645 F.Supp.2d 464, 477-78 (D.Md. 2009). An association-in-fact enterprise is not defined by a formal legal structure, but is instead characterized by the association of its members "for a *common purpose* of engaging in a course of conduct."

*United States v. Turkette,* 452 U.S. 576, 583 (1981) (emphasis added).  An association-in-fact enterprise "need not have a hierarchical structure or a chain of command; decisions may be made on an ad hoc basis and by any number of methods." *Boyle v. United States,* 556 U.S. 938, 948 (2009).  Indeed, the Supreme Court clarified in *Boyle* that an "association-in-fact" enterprise need not have any structural features beyond "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946.  As noted by the Seventh Circuit in *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.,* "[d]espite the expansive nature of this definition, it is not limitless[,]" as the alleged "person" must still have a separate identity from the purported enterprise, "[a]nd that "person" must have "conducted or participated in the conduct of the 'enterprise's affairs,' not just [its] own affairs." 719 F.3d 849, 853-54 (7th Cir. 2013) (*quoting Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (emphasis in original)).

In *Walgreen Co.,* the Seventh Circuit affirmed the United States District Court for the Northern District of Illinois's dismissal of a RICO suit against pharmaceutical manufacturers, Par Pharmaceutical Companies and Par Pharmaceutical, Inc. ("Par"), and a pharmacy, Walgreen Company ("Walgreens"), who were

alleged to be members of an association-in-fact enterprise. The
analysis in *Walgreen, Co.* is instructive here. There, Par and
Walgreens were alleged to have engaged in a fraudulent scheme to
overcharge insurance providers, by filling prescriptions for
several generic drugs with dosage forms that differed from
(*e.g.,* switching from tablet to capsule and vice versa), and
were more expensive than the dosage forms prescribed by the
physician, in order to increase their profits. *Id.* at 851-53.
"According to the complaint, the members of the enterprise
associated for the common purpose of profiting from illegally
submitting Par's more expensive dosage forms [] for cheaper
dosage forms actually prescribed." *Id.* at 854. "The complaint
further allege[d] that communications between the parties, as
well as Walgreens's implementation of the illegal dosage-form-
switching program using Par's pills, establishe[d] relationships
among the enterprise's members." *Id.* Finally, the scheme's
multi-year duration was alleged to establish longevity. *Id.*
The Seventh Circuit noted that *Boyle* "took a liberal view of
what it takes to be an association-in-fact for RICO purposes;"
but found nevertheless that "[e]ven if [it] were to assume []
that the complaint sufficiently plead[] the *existence* of an
association-in-fact enterprise under *Boyle*, it does not
adequately allege that Walgreens and Par were conducting the
affairs of this ["enterprise,"] as opposed to their own

34

affairs." *Id.* (emphasis in original).   The court noted that "nothing in the complaint reveals how one might infer that these communications [between the parties] and actions were undertaken on behalf of the enterprise as opposed to on behalf of Walgreens and Par in their individual capacities, to advance their individual self-interests." *Id.*   The court further explained that:

> [T]he activities the complaint describes are entirely consistent with Walgreens and Par each going about its own business, with Par manufacturing generic drugs and marketing its product to pharmacies, and Walgreens purchasing drugs and filling prescriptions.
>
> To be sure, Walgreens and Par were not strangers.    Representatives from the companies regularly communicated with one another, and Walgreens purchased its generic [drugs] from Par.    This type of interaction, however, shows only that the defendants had a commercial relationship, not that they had joined together to create a distinct entity for purposes of improperly filling [generic drug]    prescriptions.    Although    the [plaintiff's] allegations do not entirely rule out the inference that Walgreens and Par were acting in concert on behalf of a shadow enterprise while maintaining the outward appearance of a normal commercial relationship, there is ultimately not enough in this complaint to elevate that inference from a "sheer possibility" to something that is "plausible on its face."
>
> Nor does the fact that Walgreens's and Par's activities were by all appearances illegal indicate that the companies were acting on behalf of a distinct enterprise.    A corporation, after all, is perfectly capable of breaking the law on its own behalf.    The

> complaint describes conduct that might
> plausibly state a claim for fraud (among
> other things) against either defendant, but
> RICO does not penalize parallel,
> uncoordinated conduct. [Plaintiff] cannot
> bootstrap its allegations of illegal conduct
> into allegations that Walgreens and Par
> conducted the affairs of an enterprise by
> asking us to infer that because the
> activities were illegal, they therefore must
> also have been coordinated activity
> undertaken on behalf of the ["enterprise"].

*Id.* at 855. Moreover, the Seventh Circuit rejected the plaintiff's argument that Walgreens and Par were acting on behalf of the purported enterprise because they could not have achieved the drug-switching scheme on their own. *Id.* at 856. The court noted that "while it is true that Walgreens does not make drugs and Par does not fill prescriptions, and that the two companies must therefore 'cooperate' in order for drugs to reach consumers, such cooperation describes virtually every prescription pharmaceutical distribution chain." *Id.* The court found that the allegations in the complaint did not "[fall] outside the bounds of the parties' normal commercial relationship" and therefore there was no "basis for inferring that Walgreens and Par were conducting the enterprise's affairs." *Id.*

As in *Walgreen Co.,* the allegations in the Cigna entities' complaint fall short of plausibly alleging that each ASC and SurgCenter were engaged in concerted affairs that were

36

undertaken on behalf of a separately identifiable association-in-fact that is distinct from the ASC and SurgCenter. Taking the Cigna entities' allegations as true, it is unclear what affairs each ASC and SurgCenter conducted separate from their own affairs, and whether there was any concerted ongoing conduct between the members of these purported enterprises. SurgCenter is alleged to have developed the fraudulent billing scheme and to have pitched the idea to each ASC, invested in each ASC, and provided operational support to each ASC such as providing the language on the claims forms that were purportedly used to defraud the Cigna entities. The ASCs are alleged to have lured the Cigna entities' plan members in to their surgery centers, provided them medical care, and then submitted fraudulent bills with misrepresentations in them in order to obtain excessive payments from the Cigna entities and profit therefrom. These allegations fail to show that the alleged "enterprises" had any affairs that were separate from those of their affiliate members' businesses. In fact, the purported affairs of the "enterprises" were providing medical care and submitting fraudulent bills based on that care in order to obtain excessive insurance claim payments from the Cigna entities, but this simply describes the affairs of each individual ASC, not some separate enterprise. In order to state a claim under RICO § 1962(c), the "person" and "the enterprise" must be distinct.

The ASC cannot be both the tool through which the racketeering occurred and the person responsible for using that tool in a manner that violates RICO.   In addition, enterprises are characterized by ongoing, concerted activities and members that function as a continuing unit.   The Cigna entities have not provided factual support showing that SurgCenter participated or conducted the ongoing affairs of said "enterprises."   *See Reves v. Ernst & Young,* 507 U.S. 170, 185 (1993) (noting that under § 1962(c) a "person" may be liable if they are "'associated with' an enterprise and participate in the conduct of its affairs — that is, participate in the operation or management of the enterprise itself").   SurgCenter is alleged to have developed and pitched the fraudulent billing scheme to the ASC and then provided "operational support."   The only specific allegation showing SurgCenter's support for the scheme is that it provided the language that was used in the ASCs' claim forms submitted to the Cigna entities and the patient responsibility calculation forms.   The Cigna entities' allegation that SurgCenter provided ongoing operational support is devoid of any factual support, aside from what appears to be this singular act of consulting by providing language to use in these forms.   These allegations are not sufficient to show that SurgCenter and the ASCs were working together to conduct continuous, ongoing affairs of the purported enterprises.   The only continuous, ongoing fraudulent activity

alleged is that of the ASCs, which cannot in and of themselves constitute "persons" and "enterprises" within the meaning of RICO § 1962(c).

Moreover, although the ASCs and SurgCenter are both alleged to have taken some part in this purportedly fraudulent billing scheme, the allegations in the complaint do not show that the billing scheme was part of ongoing, concerted activities by members of some separately identifiable enterprise. Rather, the allegations in the complaint are consistent with SurgCenter and each ASC carrying out their own business initiatives albeit perhaps in a fraudulent manner. SurgCenter developed the purportedly fraudulent business model, pitched it to various ASCs, and then became an investment partner in each ASC, providing intermittent operational support. Each ASC provided medical services to patients and submitted purportedly fraudulent claim forms to the Cigna entities. Like the defendants in *Walgreen Co.,* the Defendants here are not strangers, they have a commercial relationship which is profitable to both parties: SurgCenter, like Par, pitched the idea of the purportedly fraudulent scheme to the ASC, and the ASC, like Walgreens, carried out the actual fraudulent scheme. Although the complaint's allegations may indicate that the ASCs and SurgCenter were each engaged in fraudulent conduct, they do not plausibly allege that this was coordinated conduct performed

on behalf of a distinct enterprise.  Each ASC easily could have accomplished this fraudulent scheme on its own, and in fact, appears to have carried out most of the fraudulent conduct with minimal assistance from SurgCenter.

There is no need to address Defendants' additional arguments regarding the Cigna entities' RICO claim, as the complaint fails plausibly to allege the existence of a separate, distinct enterprise, or that each ASC and SurgCenter were conducting the affairs of such an enterprise rather than their own affairs.

### C.   State Law Claims

The Cigna entities assert the following state law claims against Defendants: fraud, aiding and abetting fraud, negligent misrepresentation, unjust enrichment, and tortious interference with contract.  Defendants have moved to dismiss these claims, arguing that:  (1) the claims are preempted by ERISA, and (2) the allegations fail to state plausible claims.

### 1.   ERISA Preemption

Defendants first argue that the Cigna entities' state law claims "relate to" or "have a connection with" an ERISA plan and should therefore be dismissed because they are preempted by ERISA § 514(a) under the doctrine of conflict preemption.  As explained by the Fourth Circuit in *Darcangelo v. Verizon Communications, Inc.*, 292 F.3d 181, 186 (4th Cir. 2002), there

40

are two forms of ERISA preemption:  conflict preemption under §

514 and complete preemption under § 502.  Conflict preemption is

the broader of the two doctrines.  "Under ordinary conflict

preemption, state laws that conflict with federal laws are

preempted[.]"  *Id.* at 186.  "ERISA § 514 expressly states the

scope of ordinary conflict preemption under ERISA:  state laws

are superseded insofar as they 'relate to' an ERISA plan.  29

U.S.C. § 1144(a)."  *Id.* at 187.  As for complete preemption,

"[t]he Supreme Court has determined that ERISA's civil

enforcement provision, § 502(a) (29 U.S.C. § 1132(a)),

completely preempts state law claims that come within its scope

and converts these claims into federal claims under § 502."  *Id.*

     In *Griggs v. E.I. DuPont de Nemours & Co.,* 237 F.3d 371

(4th Cir. 2001), the Fourth Circuit addressed the issue of

whether ERISA preempted a plan beneficiary's state law claim

against the plan administrator for negligent misrepresentation.

The Fourth Circuit elaborated on what it means to "relate to" an

ERISA plan under § 514:

          ERISA's broadly-phrased preemption clause
          provides that ERISA's provisions "supersede
          any and all State laws insofar as they may
          now or hereafter relate to any employee
          benefit plan." 29 U.S.C.A. § 1144(a) (West
          1999).  A state law "'relates to' an
          employee benefit plan, in the normal sense
          of the phrase, if it has a connection with
          or reference to such a plan." *Shaw v. Delta
          Air Lines, Inc.,* 463 U.S. 85, 96-97, 103
          S.Ct. 2890, 77 L.Ed.2d 490 (1983).  In fact,

41

"ERISA pre-empts any state law that refers to or has a connection with covered benefit plans . . . 'even if the law is not specifically designed to affect such plans, or the effect is only indirect.'" *District of Columbia v. Greater Washington Bd. of Trade,* 506 U.S. 125, 129-30, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992) (*quoting Ingersoll-Rand Co. v. McClendon,* 498 U.S. 133, 139, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990)). Of course, "[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." *Shaw,* 463 U.S. at 100 n. 21, 103 S.Ct. 2890. But, as long as the nexus between the state law and the employee benefit plan is not too tangential, "a state law of general application, with only an indirect effect on a pension plan, may nevertheless be considered to 'relate to' that plan for preemption purposes." *Smith v. Dunham-Bush, Inc.,* 959 F.2d 6, 9 (2nd Cir. 1992).

A "state law" includes "all . . . decisions . . . of any State." 29 U.S.C.A. § 1144(c)(1) (West 1999). Thus, in appropriate circumstances, state common law claims fall within the category of state laws subject to ERISA preemption. *See Ingersoll-Rand,* 498 U.S. at 140, 111 S.Ct. 478; *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 47, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). When a cause of action under state law is "premised on" the existence of an employee benefit plan so that "in order to prevail, a plaintiff must plead, and the court must find, that an ERISA plan exists," *Ingersoll-Rand,* 498 U.S. at 140, 111 S.Ct. 478, ERISA preemption will apply. Alternatively, a state law claim is preempted when "it conflicts directly with an ERISA cause of action [under § 502(a)]." *Id*. at 142, 111 S.Ct. 478; *see Powell v. Chesapeake & Potomac Tel. Co. of Va.,* 780 F.2d 419, 422 (4th Cir. 1985) ("To the extent that ERISA redresses the mishandling of

> benefits claims or other maladministration
> of employee benefit plans, it preempts
> analogous causes of action, whatever their
> form or label under state law.").

*Id.* at 377-78 (first alteration in original). Accordingly, state law causes of action "relate to" employee benefit plans within the meaning of § 514, if they are premised on the existence of an employee benefit plan or if they directly conflict with an ERISA cause of action under § 502. In *Aetna Health Inc. v. Davila,* 542 U.S. 200, 208-09 (2004), the Supreme Court described the circumstances under which a state law claim is preempted because it directly conflicts with a cause of action under ERISA's civil enforcement provision § 502(a), stating that: "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy *conflicts* with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Id.* (emphasis added). In assessing the preemption issue in *Davila*, the Court noted, in relevant part, that "if an individual, at some point in time, could have brought his claim under ERISA § 502(a)[], and where there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)[]." *Id.* at 210. The Court also commented that "any civil action to enforce [a duty that arises independently of any duty imposed by ERISA

or the plan terms] is not within the scope of the ERISA civil
enforcement mechanism." *Id.* at 212.

Defendants contend that the Cigna entities' state law
claims "relate to" ERISA plans because they are premised on the
ASCs' waiver of members' cost-sharing responsibilities, which
were required by the plans, and the Cigna entities' subsequent
payment of claims based on the purportedly false charges the
ASCs submitted. (ECF No. 41-1, at 26). Defendants aver that
the Cigna entities' arguments as to why the ASCs' charges were
false or fraudulent and why the Cigna entities should not be
required to pay them stem from the terms of the plans —
specifically, the plans were only required to pay the ASCs'
"normal charges" for the services provided and therefore,
inflated charges were excluded from coverage. Defendants
conclude that because the Cigna entities' state law claims
depend on an interpretation of the ERISA plans at issue, the
claims are preempted and should be dismissed.

The Cigna entities contend that their state law claims are
not preempted by ERISA because the focal point of their claims
is Defendants' fraudulent conduct, in particular, the submission
of fraudulent claim forms to the Cigna entities. According to
the Cigna entities, their state law claims survive preemption
because the court "need not interpret the terms of [their] plans
in order to determine that Defendants committed fraud and were

44

unjustly enriched by submitting fictional charges to [the Cigna entities]." (ECF No. 44, at 20).

As noted by the Fourth Circuit in *Griggs*, determining whether claims "relate to" an ERISA plan requires a closer look at the factual nature of the claims asserted.  237 F.3d at 379. The factual bases of the Cigna entities' state-law claims are that Defendants engaged in a fraudulent dual pricing and fee-forgiving scheme in order to obtain overpayments from the Cigna entities for the services they were rendering to plan members. The Cigna entities allege that the crux of the scheme involved Defendants' submission of claim forms that included fraudulent or negligent misrepresentations.   The Cigna entities further allege that the ASCs knew that the statements and representations they were making were false, or in the alternative, that the ASCs did not use reasonable care in communicating their charges to the Cigna entities.   The Cigna entities aver that they reasonably relied on Defendants' materially false statements and omissions and paid these false charges, resulting in financial injury to them, and that the ASCs have been unjustly enriched by retaining these overpayments.   The Cigna entities allege in the aiding and abetting fraud claim that SurgCenter "knowingly and substantially assisted in the fraudulent conduct" by designing and implementing the scheme and providing assistance to the ASCs

in carrying out the scheme, such as by supplying the "language used on claims forms" that were used to defraud the Cigna entities. (ECF No. 1 ¶¶ 229, 231).

The Cigna entities' allegations do not have a sufficient connection with ERISA plans such that their claims "relate to" or have "connection with" the plans in order to trigger ERISA preemption. The Cigna entities' fraud-based claims are not premised on the existence of an employee benefit plan, *see Ingersoll-Rand,* 498 U.S. at 140, nor do they conflict directly with an ERISA civil enforcement action under § 502(a).[7]  *Cf. Griggs,* 237 F.3d at 378-79 (finding that "ERISA preempts state common law fraudulent or negligent misrepresentation when the false representations concern the existence or extent of benefits under an employee benefit plan" because failing to provide sufficient plan information is an allegation concerning a "core function performed by an ERISA fiduciary"). Although some of the allegations in the complaint reference ERISA plans, the core allegations of misconduct that the Cigna entities have pled for their state law causes of action relate to the fraudulent or negligent misrepresentations that the ASCs made to the Cigna entities in order to obtain payments to which they may

---

[7]  As discussed above, the Cigna entities' claim seeking reimbursement of plan funds cannot be brought under ERISA § 502(a)(3)(B) because it seeks legal rather than equitable relief.

not have been entitled had they accurately and fully represented
the amounts they charged patients.   Accordingly, the Cigna
entities' allegations supporting their state law claims arise
from Maryland tort law, rather than obligations or duties
arising out of the plans themselves.   *See Davila*, 542 U.S. at
212-14 (noting that any civil action to enforce a duty that
arises independently of any duty imposed by ERISA or the plan
terms does not fit within the scope of the ERISA civil
enforcement mechanism); *see United Healthcare Servs., Inc. v.
Sanctuary Surgical Ctr., Inc.,* 5 F.Supp.3d 1350, 1361 (S.D.Fla.
2014) ("Defendants had a common law and statutory duty to
refrain from making misrepresentations in the presentation of
insurance claims for benefits.   The obligation to meet that duty
is not dependent on the terms of any ERISA plan, and arises
independently from any contractual duties imposed by ERISA.");
*Horizon Blue Cross Blue Shield of New Jersey v. E. Brunswick
Surgery Ctr.,* 623 F.Supp.2d 568, 578 (D.N.J. 2009) (finding that
the plaintiff's allegations (plan administrator) regarding
Defendants' (health care providers) "comprehensive scheme to
circumvent and compromise [p]laintiff's contractual arrangements
with in-network providers" in order to "siphon business from
[p]laintiff's in-network providers" went "far beyond a simple
dispute over benefits due or not due to a plan participant under

ERISA" and instead, were based in common law fraud and tortious interference).

The allegations underlying the tortious interference claim vary slightly from the Cigna entities' other state law claims. The Cigna entities allege that "each of the [plan beneficiaries] for whom the ASCs submitted benefit claims and received payment from [them] received health care benefits pursuant to a benefit plan insured or administered by [the Cigna entities]." (ECF No. 1 ¶ 252). The Cigna entities allege that these ERISA plans required the member to pay his or her cost-sharing responsibility in order for the plan to cover a portion of the charges that were submitted for the service rendered. They further allege that despite Defendants' *knowledge* of this plan requirement, they "engaged in a fraudulent dual pricing scheme in order to bill [the Cigna entities] and [their] ASO clients inflated charges in excess of those actually charged to the patients, to induce the patients to use the ASCs' out-of-network services, and to undermine and circumvent [the Cigna entities'] provider network system." (*Id.* ¶ 254).

These allegations do not sufficiently "relate to" an ERISA plan such that this claim must be preempted. This claim is not duplicative of an ERISA civil enforcement provision under § 502(a). As discussed above, the Cigna entities' claim for equitable reimbursement under § 502(a)(3)(B) is not cognizable,

48

because the Cigna entities seek legal damages rather than
equitable reimbursement. As with the Cigna entities' fraud-
based claims, the misconduct complained of does not involve
ERISA entities and the misadministration of ERISA benefits, but
the intermeddling of third party providers in a contract between
the Cigna entities, the plan administrators, and the plan
beneficiaries. *See E. Brunswick Surgery Ctr.,* 623 F.Supp.2d at
578 (finding that an insurance company's claim against an "out
of network" provider for tortious interference with contract was
not preempted by ERISA because the insurer's claim was "not
predicated on an alleged failure to provide full benefits to a
plan participant" but rather, on the defendants' "alleged
comprehensive scheme to circumvent and compromise [the
insurer's] contractual arrangements with in-network providers").
Accordingly, this is not an instance where Plaintiffs are trying
to "evade ERISA's enforcement provisions by characterizing
[their] claims as arising under common law," when in fact they
arise under ERISA. *See E. Brunswick Surgery Ctr.,* 623 F.Supp.2d
at 578. Rather, this claim is based on Defendants' violation of
an independent duty, separate and apart from any ERISA
violations, the duty imposed by Maryland common law that
prohibits persons from intentionally inducing others to breach
their contracts with third parties. Although a plan
beneficiary's acceptance of a fee-waiver may constitute a breach

of the plans' terms, the conduct at issue here is Defendants'
inducement of plan beneficiaries to engage in such a breach.
This conduct may violate a legal duty, separate and apart from
any obligation imposed by ERISA.

Other courts addressing ERISA preemption of similar state
law claims in cases involving factual scenarios analogous to the
present case have also found that the state law claims were not
preempted by ERISA. *See Arapahoe Surgery Ctr., LLC v. Cigna
Healthcare, Inc.,* No. 13-CV-3422-WJM-CBS, 2015 WL 1041515, at
*6-7 (D.Colo. Mar. 6, 2015) (finding that the insurance
carrier's state law claims against ambulatory surgical centers
for fraud, aiding and abetting fraud, negligent
misrepresentation, unjust enrichment, and tortious interference
with contract were not preempted by ERISA because they did not
sufficiently "relate to" ERISA plans in order to trigger
conflict preemption); *United Healthcare Servs., Inc. v.
Sanctuary Surgical Ctr., Inc.,* 5 F.Supp.3d 1350, 1363 (S.D.Fla.
2014) (internal citation omitted) ("Because [the plan
administrator] is not charging an ERISA entity with
improprieties under an ERISA plan, and because its state law
claims [of fraud, misrepresentation, and unjust enrichment
against defendants for submitting false or fraudulent claims] do
not have a nexus with an ERISA plan or a plan's benefit system
in the sense the claims are based on the failure of a plan to

pay covered benefits, the court concludes that [the plan administrator's] claims do not have sufficient 'connection with' an ERISA-regulated plan to 'relate to' such a plan and trigger ERISA [conflict] preemption."); *Aetna Health Inc. v. Health Goals Chiropractic Center, Inc.,* No. 10-5216-NLH-JS, 2011 WL 1343047, at *3-6 (D.N.J. Apr. 7, 2011) (finding that state statutory and common law fraud laws imposed a duty on health care providers, separate and independent from any duties imposed by ERISA, that prohibited them from engaging in fraudulent billing practices and permitted an insurance carrier to bring claims for common law fraud, statutory fraud, and negligent misrepresentation without being subject to ERISA preemption); *E. Brunswick Surgery Ctr.,* 623 F.Supp.2d at 573-78 (finding that the plan administrator's state law claims of insurance fraud, common law fraud, negligent misrepresentation, and tortious interference against ambulatory surgical centers were not completely preempted by ERISA because the administrator's allegations were based in common law fraud).

## 2.   Failure to State a Claim

Next, Defendants argue that even if the Cigna entities' state-law claims are not preempted by ERISA, they should be dismissed under Rule 12(b)(6) for failure to state a claim.

a.   **Fraud and Negligent Misrepresentation (Counts III & V)**

The Cigna entities assert a fraud claim against all ASCs based on the alleged misrepresentations and omissions in the ASCs' claim forms.

> In order to state a claim for common law fraud in Maryland, a plaintiff must allege "(1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation."

*Legore v. OneWest Bank, FSB,* 898 F.Supp.2d 912, 919 (D.Md. 2012) (*quoting Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.,* 340 Md. 176, 195 (1995)).

Maryland law also recognizes claims for non-disclosure and concealment, "two similar, yet distinct, claims sounding in fraud." *Bourgeois v. Live Nation Entm't, Inc.,* 3 F.Supp.3d 423, 459 (D.Md. 2014); *Fegeas v. Sherrill,* 218 Md. 472, 476 (1958) ("Concealment and non-disclosure are closely related and in any given situation usually overlap."). The elements of fraudulent concealment are:

> (1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or

> deceive the plaintiff; (4) the plaintiff
> took action in justifiable reliance on the
> concealment; and (5) the plaintiff suffered
> damages as a result of the defendant's
> concealment.

*Blondell v. Littlepage,* 413 Md. 96, 119 (2010). A claim for deceit by nondisclosure "requires only that the defendant remain silent about, or omit, facts[.]" *Lloyd v. Gen. Motors Corp.,* 397 Md. 108, 138 n.11 (2007). The non-disclosed fact must be material, which means it must be one on which a reasonable person would rely in making a decision. *Sass v. Andrew,* 152 Md.App. 406, 430 (2003). Like a claim for fraudulent concealment, a claim for deceit by nondisclosure will only lie if "the defendant had a duty to disclose." *Id.; Bourgeois,* 3 F.Supp.3d at 459-60.

In the alternative, the Cigna entities assert a claim for negligent misrepresentation against the ASCs, alleging that the ASCs failed to exercise reasonable care or competence in communicating their charges to the Cigna entities. To state a claim for negligent misrepresentation under Maryland law, a plaintiff must allege that:

> (1) the defendant, owing a duty of care to
> the plaintiff, negligently asserts a false
> statement; (2) the defendant intends that
> his statement will be acted upon by the
> plaintiff; (3) the defendant has knowledge
> that the plaintiff will probably rely on the
> statement, which, if erroneous, will cause
> loss or injury; (4) the plaintiff,
> justifiably, takes action in reliance on the

53

> statement; and (5) the plaintiff suffers
> damage proximately caused by the defendant's
> negligence.

*Lloyd,* 397 Md. 108, 136 (2007).

First, Defendants argue that the Cigna entities' fraud and negligent misrepresentation claims should fail because the ASCs fully disclosed in their claim forms that patients' cost-sharing requirements had been billed at in-network rates and therefore did not misrepresent, either intentionally or negligently, their charges.   In response, the Cigna entities argue that the documents attached to the complaint do not show that the ASCs adequately disclosed their billing practices to the Cigna entities.   The Cigna entities attach a sample claim form submitted by one of the ASC Defendants, which states:   "The insured's portion of this bill has been reduce[d] in amount so the patient's responsibility for the deductible and copay amount is billed at in network rates."   (ECF No. 1-4).   The Cigna entities contend that the bills only indicate that patients' copays and deductible amounts were reduced to in-network rates, but fail to disclose that the underlying charges were also discounted.   The Cigna entities aver that the language used in the claim forms shows that Defendants affirmatively sought to mislead them into believing that the ASCs charged the patient and the Cigna entity a single, common price; when in actuality, Defendants were calculating patients' cost-sharing amounts based

on much lower underlying charges, often based on Medicare rates, and then billing the Cigna entities based on a separate, exorbitant charge that had no relation to the patients' charge.

The Cigna entities have plausibly alleged a misrepresentation based on the ASCs' statement used in the claim forms that "[t]he insured's portion of *this bill* has been reduced," because this statement, without any further qualification, indicates that the insured's billed amount was the same as the amount billed to the Cigna entities, when in fact the Cigna entities allege that it was a different amount entirely. (ECF No. 1-4). In addition, the ASCs' statement that the patient's portion of this bill has been reduced, followed by the statement that "the patient's responsibility for the *deductible* and *copay* amount is billed at in-network rates" may constitute fraudulent concealment or non-disclosure. The Cigna entities have alleged that the ASCs reduced patients' bills by charging them in-network coinsurance rates, but the ASCs' claim forms fail to mention their other cost-sharing reduction practice, which significantly lowered the amounts patients were required to pay. Had the Cigna entities known that patients were billed different underlying charges or that their co-insurance rates were reduced, they may have refused to pay these claims. Accordingly, the Cigna entities have plausibly alleged that the ASCs may be liable for fraud or negligent

misrepresentation for, either intentionally or negligently, providing misleading information about their billing practices in their claim forms.

Second, Defendants argue that the ASCs were not obligated to disclose their pricing policy to the Cigna entities, and, because they owed no duty to the Cigna entities, they cannot be liable for fraud or negligent misrepresentation. Maryland ordinarily does not impose a general duty on every party to a transaction to disclose facts to the other party. *Sass,* 152 Md.App. at 430. Maryland law recognizes, though, that even where there is no duty to disclose, a person who suppresses or conceals facts that materially qualify other representations that person has made may be found liable for fraud. *Hogan v. Maryland State Dental Ass'n,* 155 Md.App. 556, 567 (2004). The Court of Appeals of Maryland has relied on the following guidance in determining whether a duty exists between two parties:

> Liability [for negligent misrepresentation] arises only where there is a duty, if one speaks at all, to give the correct information. And that involves many considerations. There must be knowledge, or its equivalent, that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that, if false or erroneous, he will because of it be injured in person or property. Finally, the relationship of the parties, arising out of contract or otherwise, must be such that in morals and

56

> good conscience the one has the right to
> rely upon the other for information, and the
> other giving the information owes a duty to
> give it with care.   An inquiry made of a
> stranger is one thing; of a person with whom
> the inquirer has entered, or is about to
> enter, into a contract concerning the goods
> which are, or are to be, its subject, is
> another.

*Griesi v. Atl. Gen. Hosp. Corp.*, 360 Md. 1, 13-14 (2000) (*quoting Weisman v. Connors,* 312 Md. 428, 447 (1988)) (alteration in original).

The Cigna entities sufficiently have alleged a duty between themselves and the ASCs because they allege that the ASCs knew that the Cigna entities would be relying on the information provided in their claim forms when determining claim payment amounts.   Accordingly, when submitting claims forms that included representations about their charges, the ASCs had a duty not to conceal or suppress material information that was necessary to qualify the true nature of their charges or billing practices.

Third, Defendants argue that the Cigna entities' allegation that they justifiably relied on these alleged misrepresentations does not meet the heightened pleading standard of Rule 9 because the Cigna entities acknowledge elsewhere in the complaint that they paid a fraction or nothing of some of the claims that were submitted, and therefore, the Cigna entities could not plausibly have relied on the claim forms in adjudicating these claims, but

rather independently determined the amounts they would pay under the applicable policies.  In response, the Cigna entities argue that even though they did not pay the full amount of the charges they were billed, they still relied on the claim forms to determine the portion of the charges that the plan was responsible for paying.  For example, they state that typically a provider submits a charge to a Cigna entity and the entity determines which portion (if any) of the charge is considered for coverage by the plan — known as the "allowed amount."  It avers that "[t]he higher the charge submitted to [the Cigna entity], the greater the plan responsibility amount and the more [the Cigna entity] must reimburse the ASCs."  (ECF No. 44, at 15).

The Cigna entities have adequately pled reliance, as they have alleged that they received the ASCs' claim forms that indicated the charges for the services that had been rendered by the ASCs, and they relied on the information provided in the claim form in processing the claim.  Defendants imply that because the Cigna entities reduced some of the claim amounts that they paid or rejected other claims entirely, the Cigna entities could not possibly have relied on the form in arriving at the payment amounts.  This argument disregards the Cigna entities' explanation as to how they process claims.  The Cigna entities have alleged that their claim adjudication process

required them to reference other information in addition to the claim form when processing a claim, some of which led to a reduction in the claim payment or an outright denial of the claim because it was not a covered expense under the terms of the plan.  Reliance on the plan terms and other information in processing claims does not undermine the allegation that the Cigna entities also relied on the charges presented in the claim forms when calculating the payment due to the ASCs, as the Cigna entities purportedly had no other means to verify the ASCs' charges other than through the claim forms.  In addition, the Cigna entities have alleged that they relied on the representation that the charges in the claim form were the same charges that had been billed to the patient.  Taking this allegations as true, the Cigna entities' reliance on this representation may have caused them to pay the ASCs amounts to which they would not have been entitled had the Cigna entities known that the patient was charged a different amount.

### b.   Aiding and Abetting Fraud (Count IV)

The Cigna entities also assert a claim against SurgCenter for aiding and abetting fraud for its assistance and encouragement in the purportedly fraudulent billing scheme.  In order to state a claim for aiding and abetting fraud under Maryland law, a plaintiff must allege that:  "1) there is a violation of the law (tort) by the principal; 2) defendant knew

about the violation, and 3) defendant gave substantial assistance or encouragement to the principal to engage in the tortious conduct." *Legacy Inv. & Mgmt., LLC v. Susquehanna Bank,* No. WDQ-12-2877, 2014 WL 824066 (D.Md. Feb. 28, 2014) (*quoting Alleco,* 340 Md. at 186).

Defendants' only argument as to this claim is that it must be dismissed because the Cigna entities failed sufficiently to allege the underlying tort of fraud.   As discussed above, however, the Cigna entities have adequately pled fraud by the ASCs.    In addition, they have alleged sufficiently that SurgCenter not only knew about the purportedly fraudulent billing scheme, but designed, implemented, and assisted the ASCs in carrying out the scheme.

### c.   Unjust Enrichment (Count VI)

The Cigna entities assert a claim for unjust enrichment against all the ASCs.   This claim is also based on the ASCs' purportedly fraudulent practice of dual pricing, which involved submitting claim forms to the Cigna entities with "false charges" that were much higher than the amounts the ASCs billed patients for the same service.   The Cigna entities allege that they processed benefits for the services provided based on these "false charges" and paid benefits that they were not obligated to cover.   According to the Cigna entities, Defendants therefore obtained a benefit based on their fraudulent practices and it

60

would be inequitable for the ASCs to retain these payments to which they were not entitled.

In order to state a claim for unjust enrichment under Maryland law, a plaintiff must plead:

> (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

*Abt Assocs. v. JHPIEGO,* 104 F.Supp.2d 523, 535 (D.Md. 2000) (*citing Everhart v. Miles,* 47 Md.App. 131 (1980)).

Defendants argue that the Cigna entities' claim for unjust enrichment is "simply another iteration of [their] claim for fraud hiding behind an equitable banner." (ECF No. 41-1, at 28). Defendants contend that because the Cigna entities' fraud allegations are insufficient, their claim for unjust enrichment is also insufficient and should be dismissed.

Not only have the Cigna entities stated a plausible claim for fraud, their allegations also state a claim for unjust enrichment. They have alleged that the ASCs obtained benefits from them (inflated claim payments) and that the ASCs had an appreciation or knowledge of the benefit conferred. Finally, the Cigna entities allege that it would be inequitable for the ASCs to retain millions in inflated payments that they received

due to their purportedly fraudulent scheme because the ASCs
would be unjustly enriched at the expense of the Cigna entities.

### d.   Tortious Interference with Contract (Count VII)

The Cigna entities assert a claim for tortious interference
with contract against all Defendants.  They allege that:

> SurgCenter and the ASCs knew that its
> patients' plans made the patients
> responsible for payment of the patients'
> cost-sharing responsibility.  Despite this
> knowledge, the ASCs, at the direction of and
> in coordination with SurgCenter, engaged in
> a fraudulent dual pricing scheme in order to
> bill [the Cigna entities] and [their] ASO
> clients inflated charges in excess of those
> actually charged to the patients, to induce
> the patients to use the ASCs' out-of-network
> services, and to undermine and circumvent
> [the Cigna entities'] provider network
> system.  Further, the ASCs, at the direction
> of and in coordination with SurgCenter,
> knowingly misrepresented to patients that
> the patients could use their "in-network"
> benefits at the ASCs.  By these actions,
> [Defendants] . . . induced the members to
> breach the terms of their plans.  In
> addition, after [the Cigna entities]
> discovered the fraudulent scheme and began
> disputing the ASCs' bills, several of the
> ASCs have made false and malicious
> statements to [Cigna entity plan] members in
> an effort to harm [the Cigna entities']
> relationship[s] with [their] members,
> mislead [] members about the terms of their
> healthcare plans, and conceal the nature of
> the ASCs' fraudulent billing schemes.

(ECF No. 1 ¶¶ 253-57).  The Cigna entities contend that these
actions by Defendants constitute tortious interference and have
caused them harm "by causing [them] to make overpayments to the

ASCs and [have] caused harm to the relationship between [the Cigna entities] and [their] members[.]" (*Id.* ¶ 259).

In *Painter's Mill Grill, LLC v. Brown,* 716 F.3d 342, 353–54 (4th Cir. 2013), the Fourth Circuit noted that:

> To establish a claim for wrongful interference with a contract [under Maryland law], a plaintiff must demonstrate "(1) [t]he existence of a contract or a legally protected interest between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third party to breach or otherwise render impossible the performance of the contract; (4) without justification on the part of the defendant; (5) the subsequent breach by the third party; and (6) damages to the plaintiff resulting therefrom." *Blondell v. Littlepage,* 185 Md.App. 123, 968 A.2d 678, 696 (2009) (internal quotation marks omitted), *aff'd,* 413 Md. 96, 991 A.2d 80 (2010).

Defendants argue that this claim should be dismissed because the Cigna entities have not alleged that their insureds breached their contracts. According to Defendants, "inducing patients to use out-of-network services does not constitute a breach of the patients' plan because, as [the Cigna entities] admit[], [their] plans expressly allow patients to seek care from an out-of-network provider." (ECF No. 41-1, at 29).

Defendants' argument is unavailing considering that the Cigna entities expressly allege that Defendants induced their plan members to breach their contracts by agreeing to cost

sharing   arrangements   —   payment   of   "in-network"   copays,
deductibles,   and   coinsurance   at   "out-of-network"   providers   —
that   conflicted   with   the   terms   of   their   plans,   which   required
that   they   pay   "out-of-network"   cost   sharing   at   "out-of-network"
providers   such   as   the   ASCs.   Accordingly,   this   claim   will   not   be
dismissed.

### D.   Declaratory Judgment (Count VIII)

The   Cigna   entities   seek   a   declaration   that   "the   claims   for
reimbursement   submitted   by   the   ASCs   are   not   for   covered   services
and   are   not   payable   under   employee   health   and   welfare   benefit
plans   that   are   insured   or   administered   by   [the   Cigna   entities].
[The   Cigna   entities]   also   seek[]   a   declaration   that   the   ASCs
must   return   all   sums   received   [from   the   Cigna   entities]."   (ECF
No. 1 ¶ 267).

The   Declaratory   Judgment   Act   provides   that   "[i]n   a   case   of
actual   controversy   within   its   jurisdiction   .   .   .   any   court   of
the   United   States   .   .   .   may   declare   the   rights   and   other
relations   of   any   interested   party   seeking   such   declaration,
whether   or   not   further   relief   is   sought."   28   U.S.C.   §   2201(a).
The   Fourth   Circuit   has   further   explained   that   a   federal   court
may   properly   exercise   jurisdiction   in   such   cases   where   three
criteria   are   met:   "(1)   the   complaint   alleges   an   actual
controversy   between   the   parties   of   sufficient   immediacy   and
reality   to   warrant   issuance   of   a   declaratory   judgment;   (2)   the

court possesses an independent basis for the jurisdiction over the parties (*e.g.,* federal question or diversity jurisdiction); and (3) the court does not abuse its discretion in its exercise of jurisdiction." *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.,* 386 F.3d 581, 592 (4th Cir. 2004) (*citing* 28 U.S.C. § 2201; *Cont'l Cas. Co. v. Fuscardo,* 35 F.3d 963, 965 (4th Cir. 1994)). "A federal court has the discretion to decline to entertain a declaratory judgment action, but . . . the court must do so only for 'good reason.'" *Cont'l Cas. Co. v. Fuscardo,* 35 F.3d 963, 965 (4th Cir. 1994) (*quoting Aetna Cas. & Sur. Co. v. Quarles,* 92 F.2d 321, 324 (4th Cir. 1937)). "In deciding whether to entertain a declaratory judgment action, a federal court should analyze whether its resolution of the declaratory action will settle all aspects of the legal controversy. . . . [I]t makes no sense as a matter of judicial economy for a federal court to entertain a declaratory action when the result would be to try a controversy by piecemeal, or to try particular issues without settling the entire controversy." *Mitcheson v. Harris,* 955 F.2d 235, 239 (4th Cir. 1992) (internal citation and quotation marks omitted)). Declaratory relief is appropriate when the court finds that (i) it will serve a useful purpose in clarifying and settling the legal relations in issue, and (ii) it will terminate and afford

relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Fuscardo,* 35 F.3d at 965.

At this juncture it is unclear whether the Cigna entities' request for a declaratory judgment is viable. First, the Cigna entities have not specified on what legal basis they are entitled to the declaratory relief they seek. As Defendants point out, to the extent the Cigna entities' requested declaration seeks return of overpayments under ERISA § 502(a)(3)(b), this relief would not be authorized as it is legal relief which falls outside the scope of ERISA. *See Arapahoe Surgery Ctr.,* 2015 WL 1041515, at *4 (noting that Cigna had merely re-framed its ERISA restitution claim in the form of a declaration, which did "not change the nature of the relief sought, which falls outside the scope of [ERISA] § 502(a)"). Second, it is not apparent how the declaration sought would settle all aspects of this controversy or whether relief would be necessary after resolution of the other claims. The Cigna entities have stated several plausible claims under other counts of the complaint that may provide bases for the relief they seek. At this time, it not clear whether the declaration sought would duplicate or supplement the other relief sought in the complaint, making it premature to dismiss this count.

IV.   **The Cigna Entities' Motion to Dismiss the ASCs'**
      **Counterclaim**

The ASCs' counterclaim against the Cigna entities asserts
six causes of action:   three under ERISA; breach of contract;
unjust enrichment; and promissory estoppel.

A.   **ERISA Claims (Counts I to III)**

Count I is a claim for benefits and clarification of rights
pursuant to ERISA § 502(a)(1)(B); Count II is a claim for breach
of fiduciary duty pursuant to ERISA § 502(a)(3); and Count III
is a claim for failure to provide information pursuant to ERISA
§ 502(c)(1)(B).   The Cigna entities have moved to dismiss these
counterclaims arguing that the ASCs: (1) have not sufficiently
pled that they have standing to bring ERISA claims; (2) cannot
pursue their claim for breach of fiduciary duty under ERISA §
502(a)(3) because they seek the same relief under ERISA §
502(a)(1)(b); and (3) have not sufficiently pled a claim for
non-disclosure of information.   (ECF No. 43).

1.   **Lack of Standing to Bring ERISA Counterclaims**

The Cigna entities first move to dismiss the ASCs' ERISA
counterclaims on the ground that the ASCs have not adequately
pled that they have derivative standing as assignees of plan
members' rights in order to bring ERISA claims.   The ASCs
expressly allege that: "[p]rior to receiving care, the ASCs'
Cigna-insured patients sign forms assigning to the ASC the

67

patient's rights and benefits under their Cigna health insurance plan.   The rights assigned include the right to appeal benefit denials and to sue."   (ECF No. 42 ¶ 35).   The ASCs also allege that, pursuant to their assignment of benefits from Cigna entities' plan members, they submitted claims to the Cigna entities for the cost of the medical services provided to their insureds.   (*Id.* ¶ 38).

The Cigna entities assert that not all assignments of ERISA rights convey the same rights.   According to the Cigna entities, to plead sufficiently that they have standing to bring their ERISA claims, the ASCs must provide the actual language of the assignments, which they have failed to do.   (ECF No. 43-1, at 12-13).   The Cigna entities assert that because the ASCs provide no allegations that their patients transferred their rights to bring claims for breach of fiduciary duty or failure to provide information, these claims must be dismissed.

Judge Bennett aptly notes in *Peninsula Regional Medical Center v. Mid Atlantic Medical Services, LLC,* 327 F.Supp.2d 572, 576 (D.Md. 2004) that:

> Section 502(a)(1)(B) confers a cause of action upon "participants," "beneficiaries," and "fiduciaries" of ERISA plans.   Other judges of this Court have held that third-party providers, such as Peninsula, may sue under § 502(a) when the provider is specifically assigned the beneficiary's rights under the ERISA plan.

*Id.* (footnotes omitted) (internal citations omitted); *Brown v. Sikora & Assocs.*, Inc., 311 F.App'x 568, 570 (4th Cir. 2008) (noting that "sister circuits have consistently recognized [derivative standing for ERISA benefits] when based on the valid assignment of ERISA health and welfare benefits by participant and beneficiaries" and that "extending derivative standing to health care providers serves to further the explicit purpose of ERISA"); *Connecticut State Dental Ass'n. v. Anthem Health Plans, Inc.,* 591 F.3d 1337, 1347 (11th Cir. 2009) ("[I]t is well-established in this and most other circuits that a healthcare provider may acquire derivative standing to sue under ERISA by obtaining a written assignment from a "participant" or "beneficiary" of his right to payment of medical benefits.").

The ASCs have plausibly alleged that they have derivative standing to bring ERISA claims on behalf of their plan members, who specifically assigned them in writing their "rights and benefits under their Cigna health insurance plan," including the "right to appeal benefit denials and to sue." (ECF No. 42 ¶ 35). The Cigna entities have argued that the ASCs are required to provide the language of the assignment sufficiently to plead standing. Few courts in the Fourth Circuit have addressed whether a party has ERISA derivative standing, and none have indicated on a motion to dismiss that the plaintiff must include in the complaint the specific language of the assignment in

order sufficiently to plead standing.  Indeed, the few cases cited by the Cigna entities for this proposition can readily be distinguished on their facts.  *See Peninsula Regional Med. Ctr.,* 327 F.Supp.2d at 576 (finding on a motion to dismiss that a healthcare provider did not have standing as a provider to bring an ERISA claim against plan administrators because it did not allege that it was assigned ERISA rights by plan members); *Brown,* 311 F.App'x at 570-71 (finding on a motion for summary judgment that a plan sponsor (employer) did not have derivative standing to assert ERISA claims as an assignee of plan participant's rights because "to have derivative standing, [it means that plaintiff] could have sued the actual ERISA participants, who would then have clearly had standing to sue for the unpaid ERISA benefits" and the plan sponsor could never have sued the actual plan participants to recover their ERISA benefits); *Chesters v. Welles-Snowden,* 444 F.Supp.2d 342, 346 (D.Md. 2006) (finding that removal from state court was not warranted because the family members of a plan beneficiary did not have standing to sue under ERISA because they were not health care providers and "[a]lthough various courts have held that assignees of participants and beneficiaries may have derivative standing under ERISA, they have only done so in cases involving health care providers to whom a participant or

beneficiary assigned their claims under an ERISA plan in exchange for health care").

Courts outside of the Fourth Circuit that have addressed whether a plaintiff's allegations regarding the assignment of rights from a plan participant or beneficiary are sufficient to confer derivative standing under ERISA have required different levels of specificity. *Compare N. Cypress Med. Ctr. Operating Co. v. CIGNA Healthcare,* 782 F.Supp.2d 294, 301-02 (S.D.Tex. 2011) (finding that plaintiff/provider had sufficiently alleged that it obtained an assignment of rights from each patient, which was sufficient to confer beneficiary status upon it to bring ERISA claims and to "withstand a facial attack on the [c]ourt's subject matter jurisdiction"), *aff'd* 781 F.3d 182 (5th Cir. 2015), *with Sanctuary Surgical Ctr., Inc. v. Aetna, Inc.,* No. 11-80799-CV, 2012 WL 993097, at *2 (S.D.Fla. Mar. 22, 2012) (finding that plaintiffs'/providers' allegations that they had been assigned rights by their patients were insufficient to confer derivative ERISA standing because plaintiffs failed to allege that they were "written assignments" of rights and did not provide the express language of the assignments) *and Franco v. Conn. Gen. Life Ins. Co.,* 818 F.Supp.2d 792 (D.N.J. 2011) (finding that plaintiff/providers had not sufficiently alleged that they obtained a valid assignments in order to confer standing under ERISA based in part on the fact that plaintiffs'

71

"complaints nowhere recite the language of the relevant assignment provisions"). The Cigna entities point to *Sanctuary Surgical Centre, Inc. v. UnitedHealthcare, Inc.,* No. 10-81589-CV, 2011 WL 6935289, at *4 (S.D.Fla. Dec. 30, 2011), for the proposition that "to sufficiently plead its standing as an ERISA beneficiary," the ASCs must "provide the language of the actual assignments." This unpublished decision from another jurisdiction is not binding and the undersigned is not persuaded that in order plausibly to allege derivative standing that the actual assignment language is needed. Of course at the summary judgment stage the ASCs will need definitively to show that the scope of the assignment covers all ERISA rights they have purportedly received from patients in order to proceed with these claims.

### 2. Breach of Fiduciary Duty Claim is Duplicative of the ASCs' Claim for Benefits and Clarification of Rights

In support of their counterclaim for benefits and clarification of rights under ERISA § 502(a)(1)(B), the ASCs allege that the Cigna entities, as plan administrators or insurers, are obligated to pay benefits to plan members and their assignees pursuant to the terms and methodology set forth in the ERISA plans. (ECF No. 42 ¶ 78). The ASCs further allege that the Cigna entities have breached the terms of their plans by "arbitrarily denying or reducing payments due to the ASCs

72

based on [their] misconstruction and/or misapplication of
[their] plans' exclusion[.]" (*Id.* ¶ 81). In support of their
breach of fiduciary duty claim under ERISA § 502(a)(3), the ASCs
allege that as "insurer and administrator of health benefit
plans governed by ERISA, [the Cigna entities are] obligated to
comply with ERISA's fiduciary duties." (*Id.* ¶ 85). The ASCs
aver that the Cigna entities' fiduciary duties with respect to
the plans include acting "solely in the interest of the
participants and beneficiaries" which involves acting with the
exclusive purpose of "providing benefits to participants and
their beneficiaries" and "defraying reasonable expenses of
administering the plan." (*Id.* ¶ 86) (*citing* 29 U.S.C. §
1104(a)(1)). The ASCs argue that the Cigna entities have
breached their fiduciary duties by denying or reducing benefits
payable to the ASCs for the services they rendered to the Cigna
entities' plan members. (*Id.* ¶ 87). They also allege that the
Cigna entities' claim denials were not only based on their
misconstruction and misapplication of the plan language, but
also were done to "(a) allow [them] to avoid [their] obligations
to pay benefits, (b) discourage [their] insureds from using out-
of-network services, and (c) coerce out-of-network providers
into becoming in-network providers." (*Id.* ¶¶ 87-88).

    The Cigna entities aver that the ASCs' claim for breach of
fiduciary duty should be dismissed because "[c]ourts in this

Circuit [] regularly dismiss a plaintiff's breach of fiduciary duty claim where it is duplicative of a claim for benefits under section 502(a)(1)(B)." (ECF No. 43-1, at 15).  According to the Cigna entities, the ASCs' claim for breach of fiduciary duty is merely a claim for benefits in disguise, as the underlying allegations for both claims are the same (that the Cigna entities wrongfully reduced or denied benefits based on their misconstruction/misapplication of plan terms), and the relief sought for both claims is the same (a monetary award equal to the value of the services rendered that was wrongfully withheld).

In *Korotynska v. Metro. Life Ins. Co.*, 474 F.3d 101, 102-04 (4th Cir. 2006), the Fourth Circuit reviewed the district court's dismissal of a plaintiff's ERISA § 502(a)(3) claim on a motion for judgment on the pleadings.  The court addressed whether a plaintiff could bring a claim under § 502(a)(3) for breach of fiduciary duty against a plan administrator based on her allegations that the plan administrator engaged in a number of improper claims administration procedures designed to deny valid claims.  The Fourth Circuit noted that:

> In *Varity* [*Corp. v. Howe,* 516 U.S. 489 (1996)], the Supreme Court held that § [502](a)(3) authorizes some individualized claims for breach of fiduciary duty, but not where the plaintiff's injury finds adequate relief in another part of ERISA's statutory scheme.  The Court, taking both parts of §

> [502](a)(3) as one whole, concluded that the
> provision creates a "catchall" which "act[s]
> as a safety net, offering appropriate
> equitable relief for injuries caused by
> violations that [§ 502] does not elsewhere
> adequately remedy." But "where Congress
> elsewhere provided adequate relief for a
> beneficiary's injury, there will likely be
> no need for further equitable relief, in
> which case such relief normally would not be
> 'appropriate.'"

*Id.* at 104-05 (internal citations omitted). The Fourth Circuit analyzed the factual allegations underlying the plaintiff's breach of fiduciary duty claim, which were essentially that: she filed for benefits under her plan, her benefits were wrongfully terminated, she appealed the termination decision, and the injury she asserted in her complaint was the financial harm that resulted from her termination of benefits. The Fourth Circuit found that based on these allegations there was no question that the plaintiff's injury was redressable elsewhere in ERISA's scheme, noting that:

> Section [502](a)(1)(B) allows plan
> participants to obtain individualized review
> of an allegedly wrongful denial of benefits.
> The plaintiff's injury here — denial of
> benefits by the plan administrator — plainly
> gives rise to a cause of action under §
> [502](a)(1)(B) and as such would usually be
> appealed under that provision. . . .
>
> . . . .
>
> Although the Second Circuit has held that
> plaintiffs may seek relief simultaneously
> under § [502](a)(1)(B) and § [502](a)(3),
> the great majority of circuit courts have

interpreted *Varity* to hold that a claimant whose injury creates a cause of action under § [502](a)(1)(B) may not proceed with a claim under § [502](a)(3).

These courts have not allowed claimants to proceed with § [502](a)(3) claims where relief was potentially available to them under § [502](a)(1)(B), because, in *Varity*, "[t]he Supreme Court clearly limited the applicability of § [502](a)(3) to beneficiaries who may not avail themselves of § [502]'s other remedies." A plaintiff whose injury consists of a denial of benefits "has adequate relief available for the alleged improper denial of benefits through his right to sue [the benefit plan] directly under section [502](a)(1)," and thus "relief through the application of Section [502](a)(3) would be inappropriate." To allow a claim under § [502](a)(3) would permit "ERISA claimants to simply characterize a denial of benefits as a breach of fiduciary duty, a result which the Supreme Court expressly rejected."

We join our sister circuits and hold that § [502](a)(1)(B) affords the plaintiff adequate relief for her benefits claim, and a cause of action under § [502](a)(3) is thus not appropriate.

*Id.* at 105-07 (internal citations omitted). Accordingly, the Fourth Circuit affirmed the district court's dismissal of the plaintiff's claim for breach of fiduciary duty under ERISA § 502(a)(3).

Based on the Fourth Circuit's holding in *Korotynska* that a § 502(a)(3) claim will not lie when a plaintiff has adequate relief under another ERISA provision, the ASCs' breach of fiduciary duty claim under § 502(a)(3) must be dismissed.  Like

76

the plaintiff in *Korotynska*, the crux of the ASCs' allegations supporting the breach of fiduciary duty claim are that the ASCs sought plan benefits on behalf of their patients (plan participants/beneficiaries), and the Cigna entities improperly denied the ASCs' claims for benefits based on their misconstruction or misapplication of the plan terms and their alleged self-interested motive of retaining increased compensation and profits. The injury alleged here is redressable under § 502(a)(1)(B), which likely is why the ASCs have also brought a claim under that provision. The Fourth Circuit does not permit "plaintiffs to seek relief simultaneously under § [502](a)(1)(B) and § [502](a)(3)," when the injury alleged creates a cause of action under § 502(a)(1)(B). *Korotynska,* 474 F.3d at 106-07.[8]

---

[8] The ASCs argue in their opposition that it is not clear at this stage in the proceedings that § 502(a)(1)(B) will afford them complete relief because some patients who have assigned their rights and benefits to the ASCs have not yet had their claims denied by the Cigna entities. Accordingly, they argue that a judgment on the ASCs' § 502(a)(1)(B) claims would not necessarily cover those patients and they should be able to proceed simultaneously with their § 502(a)(3) claim to enjoin the Cigna entities from offsetting the previous payments made to the ASCs against the costs for future services rendered to other ASC patients. As aptly noted by the Cigna entities, § 502(a)(1)(B) specifically states that an action under that section can be brought "to clarify [a participant or beneficiary's] rights to *future benefits* under the term of the plan" (ECF No. 53, at 10) — and therefore would adequately cover the availability of prospective relief for those patients whose claims have not yet been submitted to or denied by the Cigna entities.

### 3.   Failure to State a Claim for Non-Disclosure of Information

In support of their claim for failure to provide information under ERISA § 502(c)(1)(B), 29 U.S.C. 1132(c)(1)(B), the ASCs allege that "[a]s plan administrator of the health plans at issue, [the Cigna entities are] required to maintain and provide plan participants and beneficiaries, or their assignees, certain information upon request." (ECF No. 42 ¶ 94). On behalf of their Cigna-insured patients, the ASCs aver that they have "requested documents that [the Cigna entities] claim[] provide the basis for [their] refusal to reimburse the ASCs for services the ASCs have rendered" and the Cigna entities have failed to produce the requested information. (*Id*. ¶¶ 96- 97). Based on their failure to provide this requested information, the ASCs allege that the Cigna entities are civilly liable to their plan participants and their assignees for the penalty provided in 29 U.S.C. 1132(c)(1)(B). (*Id*. ¶¶ 95, 98).

The Cigna entities contend that the ASCs have not pointed to any legal authority that they had a duty to disclose the documents upon which they relied when denying claims. The Cigna entities argue that all that is required of a plan administrator upon denial of plan benefits, is "to set forth the specific reasons for such a denial[,]" (ECF No. 43-1, at 16-17) (*citing* 29 U.S.C. § 1133), a duty with which they purportedly fully

complied by informing the ASCs that their claims were denied based on the plans' exclusion of coverage for charges that patients are not obligated to pay.  The Cigna entities add that the ASCs' own pleadings show that the Cigna entities met their disclosure obligations under ERISA, because they allege that the Cigna entities informed them that their claims were being denied based on this specific policy exclusion.

The Cigna entities' arguments miss the mark.  They contend that they have met their disclosure obligations under, 29 U.S.C. § 1133, which provides that:

> In accordance with the regulations of the Secretary, every employee benefit plan shall—
>
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such a denial, written in a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

The ASCs' claim, however, is not based on the Cigna entities' failure to inform them of the reason for their claim denials; rather, the ASCs allege that the Cigna entities have failed to provide a full and fair review of their claim denials because they have failed to provide the *documentation* they

79

requested as part of their claims appeal process.  29 U.S.C. § 1132(a)(1)(A) provides a cause of action to a plan participant or beneficiary based on a plan administrator's failure to supply requested information under 29 U.S.C. § 1132(c).  29 U.S.C. § 1132(c)(1)(B), states in relevant part that:

> Any administrator . . . who fails or refuses to comply with a request for any *information which such administrator is required by this subchapter to furnish to a participant or beneficiary* (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal[.]

*Id.* (emphasis added).  Specifically, the ASCs cite 29 C.F.R. § 2560.503-1(h)(2)(iii)  ("Appeal  of  adverse  benefit determinations"), an ERISA implementing regulation, which they allege requires plans and plan administrators to provide certain documentation as part of the claims appeal process.  This regulation provides that:

> (2) Full and fair review.  [T]he claims procedures of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination *unless* the claims procedures—
>
> . . .

> (iii) Provide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section[.]

*Id.* (emphasis added). Subsection (m)(8) of this same regulation states that a "document, record, or other information shall be considered 'relevant' to a claimant's claim if such document . . . [w]as relied upon in making the benefit determination[.]" 29 C.F.R. § 2560.503-1(m)(8)(i). In addition, the ASCs cite subsection (i)(5) of this regulation, which applies to "Timing of notification of benefit determination on review," and states in relevant part:

> (5) Furnishing documents. In the case of an adverse benefit determination on review, the plan administrator shall provide such access to, and copies of, documents, records, and other information described in [subsection j.]

Subjection j requires that "plan administrators *shall* provide a claimant . . . upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." 29 C.F.R. § 2560.503-1(j)(3) (emphasis added).

The ASCs have stated a plausible violation of 29 U.S.C. § 1132(c)(1)(B) for failure to comply with a request for

information, based on their allegations that:  the Cigna
entities denied benefit claims that were submitted by the ASCs
(purported assignees of plan participants' ERISA rights) on
behalf of the Cigna entities' plan members; following the Cigna
entities' denial of claims, the ASCs "requested *documents* that
[the Cigna entities] claim[] provide the basis for [their]
refusal to reimburse the ASCs for services the ASCs have
rendered" (ECF No. 42 ¶ 96); and that [the Cigna entities]
failed to provide the requested information.  The Cigna
entities, as plan administrators, were required to provide a
"full and fair" review of their claim denials as required by 29
U.S.C. § 1133(2) and 29 C.F.R. § 2560.503-1, which included
providing, upon request, access to or copies of documents that
they relied upon in processing the claims that they denied.  The
ASCs have sufficiently alleged that they requested such
documentation after each claim was denied and that the Cigna
entities failed to provide it.

   **B.   Breach of Contract (Count IV)**

   The ASCs allege that "they treat patients who are insured
by Cigna health benefit plans that are not governed by ERISA.
As the assignees of those patients, the ASCs bring this claim
for breach of contract." (ECF No. 42 ¶ 100).  For plan members
of non-ERISA plans, the Cigna entities agree to insure these
individuals in exchange for the receipt of their premium

payments.  (*Id.* ¶ 101).   These plans are also governed by plan documents which permit members to seek out-of-network services, and that the Cigna entities "will pay a specific percentage of the lesser of (a) the actual billed charge, or (b) the usual and customary charge for a procedure based on another comparable benchmark."  (*Id.* ¶ 104).   The ASCs allege that the Cigna entities have breached this agreement by denying or reducing claim payments for their insureds' claims for out-of-network services provided by the ASCs.  (*Id.* ¶ 105).   Finally, the ASCs allege that they have been financially injured by the Cigna entities' breach and seek damages.

The Cigna entities launch the same argument against this claim as they do against the ASCs' ERISA claims, namely, that the ASCs have not sufficiently alleged that they have standing as assignees to bring this claim because they have failed to provide the actual language of the assignments.  (ECF No. 43-1, at 18).   For the same reasons discussed above, the ASCs have sufficiently alleged that they were assigned the right to pursue benefits and to sue on behalf of their patients, whether the patients were participants in an ERISA or a non-ERISA plan.

### C.   Unjust Enrichment (Count V)

The ASCs assert a claim for unjust enrichment based on the following allegations:

> [The Cigna entities have] repeatedly reduced
> or denied payment to the ASCs for care
> provided to [the Cigna entities'] insureds
> based on [their] misconstruction and/or
> misapplication of certain language in
> [their] plan documents. [The Cigna entities
> have] done so even though [their] insureds
> have paid additional premiums to [the Cigna
> entities] for the right to receive out-of-
> network care if they so desire.

(ECF No. 42 ¶ 108). The ASCs allege that as a result of the Cigna entities' reductions or denials of claim payments they have provided medical services to the Cigna entities' plan members at no cost to the Cigna entities. (*Id.* ¶ 109). The ASCs further allege that by reducing or denying payments to the ASCs, the Cigna entities have been able to increase their own compensation in the form of plan savings, and it would be inequitable for the Cigna entities to retain those savings. Accordingly, the ASCs seek an order from the court awarding them the value of all services for which the Cigna entities have reduced or denied payment. (*Id.* ¶ 112).

"[U]njust enrichment and quantum meruit, both 'quasi-contract' causes of action, are remedies to provide relief for a plaintiff when an enforceable contract does not exist but fairness dictates that the plaintiff receive compensation for services provided." *Cnty. Cmm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.,* 358 Md. 83, 96 (2000) (*quoting Dunnaville v. McCormick & Co.,* 21 F.Supp.2d 527, 535 (D.Md. 1998))

(internal quotation marks omitted). In Maryland, "[t]he general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests." *Id.* at 96 (internal citation omitted); *see also FLF, Inc. v. World Publ'ns, Inc.,* 999 F.Supp. 640, 642 (1998) ("It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties.").

The Cigna entities contend that this claim is preempted by ERISA to the extent that it relates to patients covered by ERISA plans (ECF No. 43-1, at 19), and the ASCs concede this point, (ECF No. 52, at 16 n.11). Accordingly, the ASCs' claim for unjust enrichment is asserted only as to those patients whose health benefit plans are not covered by ERISA.

The Cigna entities also challenge the ASCs' unjust enrichment claim on the basis that "Maryland law precludes recovery under a theory of unjust enrichment when a valid contract covers the same subject matter." (ECF No. 43-1, at 22). As assignees of their patients' claims, the ASCs would "stand in the shoes of their patients, and their patients' benefit plans with [the Cigna entities] clearly cover[] the subject matter of the ASCs' unjust enrichment claim[.]" (*Id.* at 23).

Although in Maryland a plaintiff may plead in the alternative by asserting claims for unjust enrichment and breach of contract, when doing so the "plaintiff's claim for unjust enrichment *must* include an allegation of fraud or bad faith in the formation of the contract." *Jones v. Pohanka Auto N., Inc.*, 43 F.Supp.3d 554, 573 (D.Md. 2014) (dismissing a plaintiff's claim for unjust enrichment, where the plaintiff had acknowledged the existence of a contract with defendant, because "nowhere in the complaint [did plaintiffs] actually allege bad faith in the formation of [the contract]"). Here, the ASCs assert claims for breach of contract based on their patients' assignment of rights under their health plans. The ASCs then argue that they are bringing the unjust enrichment counterclaim on their own behalves and not as the assignees of their patients' contractual rights. The factual allegations underlying both of these claims, however, are the same and the ASCs have not provided an independent factual basis upon which their unjust enrichment claim rests. The ASCs further allege in their countercomplaint that a valid insurance contract exists between the Cigna entities and their plan members, that the Cigna entities' plan members assigned their rights under these contracts to the ASCs, and that the ASCs are seeking recourse because the Cigna entities' misconstruction of the plans caused them to be financially harmed while the Cigna entities were

simultaneously    financially    benefitted.        Nowhere    in    the
countercomplaint   do   the   ASCs   allege   that   the   underlying
contracts or their assignments may be invalid due to fraud, bad
faith, or any other reason.  If an ASC has a valid assignment of
rights covering the subject matter of this dispute (payment of
plan benefits) from a party to the contract, then the ASC has a
valid contract remedy and need not rely on a quasi-contractual
remedy.   Accordingly, because the ASCs' allegations acknowledge
that  contracts  exist  covering  the  same  subject  matter  as  the
unjust  enrichment  claim,  the  unjust  enrichment  claim  will  be
dismissed.

####    D.    Promissory Estoppel (Count VI)

The  ASCs  assert  a  claim  for  promissory  estoppel  based  on
the  allegations  that  "[p]rior  to  providing  care  to  many  of
Cigna's insureds, the ASCs sought and obtained confirmation from
[the  Cigna  entities]  that  the  patient's  health  benefit  plan
permitted  the  patient  to  receive  that  care  from  the  ASC[.]   In
each  such  case,  [the  Cigna  entities]  specifically  represented
(either  orally,  in  writing,  or  both)  that  the  care  would  be
covered  by  the  patient's  Cigna-insured  or  Cigna-administered
health  benefit  plan."   (ECF No. 42 ¶¶ 114-15).   The ASCs further
assert that the Cigna entities reasonably expected that the ASCs
would  render  care  based  on  their  confirmation  of  coverage,  and
the ASCs did in fact rely on the Cigna entities' representations

and provide services to the Cigna entities' plan members. (*Id.* ¶¶ 116-17). According to the ASCs, after they submitted claims to the Cigna entities for the services they provided, the Cigna entities denied payment on the ground that the "patient's Cigna-insured or Cigna-administered health benefit plan did not provide out-of-network benefits." (*Id.* ¶ 118). As a result of these claim denials, the ASCs allege that they have suffered financial losses by providing care to the Cigna entities' plan members that was not covered by the plans, and these losses can be avoided only by enforcing the Cigna entities' promises that the services would be covered by the patient's plans. (*Id.* ¶¶ 119-20).

Judge Blake noted in *Goss v. Bank of America, N.A.,* 917 F.Supp.2d 445, 450-51 (D.Md. 2013) that:

> "Maryland courts, which disapprove of the term 'promissory estoppel,' have incorporated the Restatement (Second) on Contracts to adopt the analogous doctrine of 'detrimental reliance,' a tort that does not sound in fraud." *Jordan v. Alt. Resources Corp.,* 458 F.3d 332, 348 (4th Cir. 2006) (*citing Pavel Enterprises, Inc. v. A.S. Johnson Co.,* 342 Md. 143, 674 A.2d 521, 532 (1996)). "Promissory estoppel offers a vehicle to enforce a promise for which there is no consideration, but the plaintiff nonetheless relied upon the promise to his detriment in circumstances that make it unconscionable not to enforce the promise." *Edell & Assoc., P.C v. Law Offices of Peter G. Angelos,* 264 F.3d 424, 440 (4th Cir. 2001). To maintain a claim under promissory

estoppel, or "detrimental reliance," the
plaintiffs must allege:

> (1) a clear and definite promise;
> (2) where the promisor has a
> reasonable expectation that the
> offer will induce action or
> forbearance on the part of the
> promisee; (3) which does induce
> actual and reasonable action or
> forbearance by the promisee; and
> (4) causes a detriment which can
> only be avoided by the enforcement
> of the promise.

*Pavel*, 674 A.2d at 532.

The Cigna entities argue that this claim should be dismissed because it is preempted by ERISA. According to the Cigna entities, other "courts have specifically found promissory estoppel claims are preempted because allowing such claims to proceed would in essence allow a plaintiff to modify a plan's terms outside the regulatory scheme outlined through ERISA." (ECF No. 43-1, at 20).

For the same reasons the Cigna entities' state law claims are not preempted by ERISA, the ASCs' promissory estoppel counterclaim is not preempted. This claim does not arise from plan members right to recover benefits under the terms of their Cigna plans; rather, it is based on the promises made by the Cigna entities to the ASCS that the Cigna entities would pay for their plan members' services. These promises purportedly induced the ASCs to provide services to patients to their own

detriment because the Cigna entities later reneged on their promises. Accordingly, the ASCs' counterclaim arises independent of ERISA under the doctrine of promissory estoppel or detrimental reliance. Numerous courts that have assessed promissory estoppel claims factually similar to that of the ASCs' (made by providers against insurers who have promised that services were covered by the insurance plan and then later refused to pay for them), have found that these claims were not preempted by ERISA. *See Nat'l Centers for Facial Paralysis, Inc. v. Wal-Mart Claims Administration Group Health Plan,* 247 F.Supp.2d 755, 760 (D.Md. 2003) (finding that a provider's promissory estoppel claim against a plan administrator was not preempted by ERISA); *Oak Brook Surgical Ctr., Inc. v. Aetna, Inc.,* 863 F.Supp.2d 724, 730 (N.D.Ill. 2012) (finding that a provider's claim against an insurance company for promissory estoppel was not preempted by ERISA and indicating that "the court is fundamentally troubled by [the insurer's] insistence that it can make whatever representations it desires with impunity because ERISA shields it from liability"); *Denver Health & Hosp. Auth. v. Beverage Distribs. Co., LLC,* 843 F.Supp.2d 1171, 1183-84 (D.Colo. 2012), *aff'd* 546 F.App'x 742 (10th Cir. 2013) (finding that a third party provider's promissory estoppel claim brought on its own behalf against an insurer that made promises to the provider to pay for a

patient's services was not preempted by ERISA); *cf.* *Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.,* 662 F.3d 376, 383 (5th Cir. 2011), *opinion reinstated in part on reh'g,* 698 F.3d 229 (5th Cir. 2012) (finding that a provider of medical devices's claim for negligent misrepresentation against an insurer "premised on allegations that it was misled by an ERISA [plan administrator's] statements regarding the extent of coverage for the provider's services" was not preempted by ERISA).

The Cigna entities further contend that the ASCs' promissory estoppel claim should be dismissed because their allegations are "missing a key element of promissory estoppel under Maryland law — that [the Cigna entities'] actions caused detriment which can **only** be avoided by the enforcement of the promise." (ECF No. 43-1, at 23) (emphasis in original) (internal citation and quotation marks omitted). The Cigna entities aver that the ASCs' allegations fail to meet the last element of this claim because enforcement of their alleged promises is not the *only* way to avoid detriment to the ASCs. The Cigna entities point to the fact that the ASCs allege elsewhere in their counterclaim that their patients remain responsible for the full amount of their charges if the Cigna entities do not pay. Based on this assertion, the Cigna entities argue that no injustice will result if their alleged promises are not enforced because the ASCs can collect from

91

their patients any outstanding amounts due to them, thereby avoiding any detriment.

The Cigna entities' argument is unavailing. The ASCs' claim for promissory estoppel or detrimental reliance centers on the *Cigna entities'* promises to pay the ASCs for their services. The Cigna entities essentially are arguing that the ASCs' patients also promised to pay and therefore, the ASCs' counterclaim should properly be against their patients. The ASCs are the master of their counterclaim, however, and chose to assert promissory estoppel against the Cigna entities, rather than their patients. The Cigna entities cite no authority indicating that the ASCs' potential right to recover from a third party payor would excuse the promisors from honoring their own promises to pay.[9]

_____

[9] Moreover, the cases cited by the Cigna entities for the proposition that "the ASCs cannot *show* that any 'injustice' would result" (ECF No. 43-1, at 24) (emphasis added), are inapplicable here because those cases involved factual determinations made in the context of motions for summary judgment or at trial. *See Pavel,* 342 Md. at 168 (finding that there was "sufficient evidence in the record to support the trial judge's conclusion that [plaintiff] had not proven its case for detrimental reliance"); *Citiroof Corp. v. Tech Contracting Co., Inc.,* 159 Md.App. 578, 586, 589 (2004) (finding that the trial court's determination that the evidence was sufficient to satisfy the elements of detrimental reliance was not clearly erroneous); *Union Trust Co. of Md. v. Charter Med. Corp.,* 663 F.Supp. 175, 179 (D.Md. 1986) (finding on a motion for summary judgment that the record did not establish that the plaintiff's substantive allegations supporting its claim for promissory estoppel were supported and therefore entering judgment against it). Indeed, only one case cited by the Cigna

**V.    Conclusion**

For the foregoing reasons, Defendants' motion to dismiss and the Cigna Entities' motion to dismiss will be granted in part and denied in part.  A separate order will follow.

                                    /s/
                            DEBORAH K. CHASANOW
                            United States District Judge

---

entities involved the dismissal of a promissory estoppel claim, and that case is factually distinguishable.  *Wynn v. Hewlett-Packard Co., No. 8:11-CV-01287-AW, 2012 WL 113390,* at *3-4 (D.Md. Jan. 12, 2012) (finding that plaintiff had not stated a plausible claim for promissory estoppel because the allegations did not state an existence of a clear and definite promise and the detriment complained of was based on an employer's promise to vest stock benefits on a certain date and plaintiff retired prior to that date, making her ineligible for vesting anyhow).